IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CORE LABORATORIES LP f/k/a | § | |
| CORE LABORATORIES, INC.; and | § | |
| SAYBOLT LP, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Case No.: 16-cv-526 |
| | § | |
| AMSPEC, LLC; | § | |
| BOBBY DAVENPORT; | § | |
| HUGH FREEMAN; and | § | |
| TRAVIS STAIR, | § | |
| *Defendants.* | § | JURY DEMANDED |

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
*EX PARTE* TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION,
AND PERMANENT INJUNCTION, AND REQUEST FOR DISCLOSURE**

## I.   PARTIES

1.     Plaintiff Core Laboratories LP, formerly known as Core Laboratories, Inc., ("Core Lab") is a Delaware limited partnership with its principal place of business at 6316 Windfern Road, Houston, Texas 77040.

2.     Plaintiff Saybolt LP ("Saybolt") (together with Core Lab, "Plaintiffs") is a Delaware limited partnership with its principal place of business at 6316 Windfern Road, Houston, Texas 77040.  Saybolt has an office and does business at 1123 Saraland Blvd South # C, Saraland, Alabama 36571.

3.     Plaintiffs both have a limited partner, Core Laboratories Holdings LLC, and a general partner, Core Laboratories LLC, which are Delaware limited liability companies.  The parent company of both the limited partner and general partner is Core Laboratories (U.S.) Interests

Holdings Inc., a Texas corporation with its principal place of business at 6316 Windfern Road, Houston, Texas 77040.

4.      Defendant AmSpec, LLC ("AmSpec") is a New Jersey limited liability company with a principal place of business of 1249 South River Road Suite 204, Cranbury, New Jersey 08512.   Amspec's member is Incline Equity Partners, LP, a Delaware limited partnership. AmSpec is owned by AmSpec Holding Corp., which is a Delaware corporation.  AmSpec has an office and does business in Mobile, Alabama at 5237 Halls Mill Road Building U, Mobile, Alabama 36619.  AmSpec may be served with process through its registered agent Corporation Service Company d/b/a CSC Lawyers, Incorporating Service, Inc. at 150 South Perry Street Montgomery, Alabama 36104, or wherever AmSpec may be located.

5.      Defendant Bobby Davenport is an individual who resides at 23709 Red Bluff Road, Moss Point, Mississippi 39562.

6.      Defendant Hugh Freeman is an individual who resides at 7031 Rose Ching Drive, Mobile, Alabama 36618.

7.      Defendant Travis Stair (collectively hereinafter referred to jointly along with AmSpec, Davenport, and Freeman, as "Defendants") is an individual who resides at 853 Willow Bridge Drive West, Mobile, Alabama 36695.

8.      Core Lab and Saybolt are affiliated companies that are both part of the global Core Laboratories group of companies.  All employees who work in the Saybolt operation in the United States are Core Lab employees.  Except as specifically noted, all references to Core Lab or Saybolt in this complaint include both companies.

## II.     JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over this matter because there is complete diversity between the Plaintiffs and Defendants and the amount in controversy exceeds $75,000, and this dispute also includes a cause of action that arises under federal law, and all other claims are so related to the federal law that creates the cause of action that they form part of the same case or controversy.  28 U.S.C. §§ 1331, 1332, 1367.

10.     This Court has personal jurisdiction over AmSpec and Davenport because Plaintiffs' claims arise out of AmSpec and Davenport's acts and omissions in Mobile County, Alabama.  This court has personal jurisdiction over Freeman and Stair because they are citizens and residents of Alabama.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) .

## III.     FACTS

### A.     Saybolt builds a profitable relationship with Chevron-Pascagoula.

12.     Saybolt provides inspection, monitoring, and testing services to the oil and gas industry.  Saybolt has been in business for over a century.  From its beginnings as a one-person surveying company in 1898, Saybolt has grown into a leading international service provider with offices and laboratories throughout the world.

13.     For many years, Saybolt has provided testing and inspection services in the Mobile, Alabama area.  Saybolt has a sizable facility and operations in Saraland, Alabama, which is a suburb of Mobile, Alabama.  Chevron is Saybolt's largest customer at this facility and operates a

large refinery in the nearby city of Pascagoula, Mississippi.  Saybolt generates substantial revenues every year from this Chevron-Pascagoula work.

14.     Saybolt invested heavily in building up the Chevron-Pascagoula relationship over the course of many years.  As of 2016, Saybolt dedicated at least three inspectors, a scheduler, and two lab technicians to work full-time on Chevron projects.  These professionals got to know Chevron's business and Chevron developed confidence in their ability to meet Chevron's needs.  These individuals were also constantly available to Chevron, meaning that they could respond to requests on very short notice.  The three inspectors completed a months-long qualification process required by Chevron.  Because of Saybolt's business development efforts over many years, Saybolt received a significant percentage of Chevron's work in the Mobile area.

**B.     Plaintiffs develop trade secrets.**

15.     In the course of building a strong business relationship with Chevron and other customers, Plaintiffs invested substantial time, money, and effort to gain a legitimate advantage over its competitors in the industry.  To that end, Plaintiffs developed lab test procedures for its sample analysis and testing.  Plaintiffs further collected customer contact lists, and customized pricing lists for its various customers.

16.     Plaintiffs strove to keep secret that information which it developed and which gives it a legal competitive advantage in the market.  Among the ways it sought to achieve this goal was by requiring its employees to agree that they would "hold all such information in confidence and not disclose [it] to anyone outside of the Company, either while [the employee was] an employee or thereafter." December 8, 1997 Bobby Davenport Employee Agreement, attached as Exhibit A, ¶ 6.  Davenport, Freeman, and Stair all signed contracts with this provision before Plaintiffs trusted

them with their trade secrets.  *See id.*; May 28, 1999 Hugh Freeman Employee Agreement, attached as Exhibit B, ¶ 6; May 31, 2002 Travis Stair Employee Agreement, attached as Exhibit C, ¶ 6.

> **C.    AmSpec conspires with Saybolt employees to steal Chevron business and Saybolt trade secrets.**

17.    AmSpec is a competitor of Saybolt and other inspection and testing companies and is headquartered in New Jersey, though it operates in multiple states in the United States.  Before September 2016, AmSpec did not have any facilities, inspectors, or lab technicians in the Mobile area and did not perform any work with Chevron's Pascagoula refinery.  Because AmSpec's closest location was in Louisiana, AmSpec was unable to do any work for Chevron-Pascagoula and was not a competitor for business in that specific area.

18.    In this case, AmSpec knew that Saybolt's operations in Mobile were highly profitable and wanted to gain a foothold for AmSpec in this market.  But AmSpec knew that it would take many years to build up a business like Saybolt and develop knowhow comparable to Saybolt's.  AmSpec knew that building a business in a legitimate manner would require AmSpec to make substantial investments in facilities, personnel, and research, and develop customer relationships from scratch.  This was a risky proposition, with no guarantee that AmSpec's investments would pay off.

19.    So AmSpec decided to take a shortcut.  AmSpec, as it had on several other occasions around the nation, decided on a course of action to pursue the hiring of a critical mass of a competitors' employees.

20.    AmSpec planned to raid Saybolt's operation, recruit the office manager and chief scheduler, and use these employees to recruit all of the inspectors and lab technicians who worked on Chevron projects.  In this way, AmSpec would be able to capture Saybolt's largest customer, instantly disqualify Saybolt from being able to handle the work for lack of adequate Chevron-

certified personnel, and, at the same time, instantly build a thriving business in Mobile without the years of investment and hard work that Saybolt had put in.  In all, AmSpec used this tactic to steal away seven Saybolt employees: the office manager, the scheduler, two lab technicians, and three inspectors – and hence instantly turn the tables on the Chevron work.

21.     AmSpec knew that this course of conduct was wrongful.  As AmSpec is well aware, most people who work in the inspection business have employee agreements that contain non-solicitation provisions.  Saybolt requires employees to sign agreements in which they promise "not to solicit, hire, or endeavor to entice away any employees of the Company, or knowingly interfere with the business relationship between the Company and any customer" for two years after leaving the company.  *See, e.g.,* Exhibit A, ¶ 10; Exhibit B, ¶ 10; Exhibit C, ¶ 10.  All of the employees that AmSpec planned to recruit had signed contracts with this provision.[1]  AmSpec knew, or reasonably should have known, that Saybolt's entire Chevron team was under these obligations.

22.     The first person that AmSpec recruited was Bobby Davenport, a former Saybolt business development manager who had retired in June 2015 and who is still within the two-year non-solicitation period.  AmSpec knew that Davenport had a close relationship with Chevron, where he had worked for many years as a manager at Chevron-Pascagoula before joining Saybolt in 1997.  AmSpec also knew that Davenport had a close relationship with Freeman and other Saybolt personnel with whom he had worked during his eighteen years with Saybolt.

23.     AmSpec formed a plan that if it could hire Davenport and have him work to solicit Freeman and other Saybolt employees, and also have those other Saybolt employees (including Freeman and Stair) also solicit internally at Saybolt, it could succeed in acquiring the Chevron

---

[1]     The Davenport, Freeman, and Stair Employee Agreement all provide that Texas state law governs the agreements "without regard to the place of execution or the place of performance." Ex. A. at ¶ 12; Ex. B at ¶ 12; Ex. C at ¶ 13.

work and at the same time disqualify Saybolt from doing that work because it would no longer have adequate personnel.  AmSpec knew, or should have known, that Davenport was under a non-solicitation obligation to Saybolt but hired him anyway to help recruit Saybolt employees and Chevron business.

24.     With Davenport's assistance, AmSpec next recruited Hugh Freeman, the location manager at Saybolt's Mobile facility and the highest-ranking employee, as well as Travis Stair, Saybolt's scheduler who was dedicated to Chevron work.  While Freeman and Stair were employed by Saybolt and still had fiduciary duties to the company, AmSpec encouraged them to help recruit other members of Saybolt's Chevron team.  These recruits included inspectors Gary Lynch, Patrick Perry, and Jordan Sellers and lab technicians Jimmy Driskell and Keke Hoang.  All of these individuals worked full-time on Chevron projects.

25.     In direct violation of their duties as Saybolt employees, Freeman and Stair actually conducted interviews for AmSpec during the time that they were on the Saybolt payroll.  Some of these interviews took place at the new facility that AmSpec was building in Mobile.  Freeman and Stair were acting as agents of AmSpec and AmSpec management appears to have known about these activities.

26.     At the same time they were interviewing potential employees for a new competitor, Freeman and Stair were stealing Plaintiffs' trade secrets.  Computer forensic analyses of the electronic devices Freeman and Stair used while employed by Plaintiffs reveal that Freeman and Stair accessed, downloaded, and transferred a large number of confidential files to external drives in the months leading up to their departure.  The files they stole included confidential trade secret information related to customers, pricing, business strategy, and laboratory testing.

**C.     AmSpec directs a mass exodus of Saybolt's entire Chevron team.**

27.     Beginning earlier in 2016, Saybolt began hearing rumors that some employees were planning a mass exodus.  When questioned about this, Freeman and Stair denied any knowledge of this plan and dismissed these rumors as false.  In August 2016, the rumors intensified and Core Lab's general counsel sent Freeman a copy of his employee agreement and encouraged him – as manager of the Saybolt facility and as one who owed a fiduciary duty to Saybolt, while employed by the company – to remind his employees of their non-solicitation obligations.  Freeman ignored this request and continued his efforts to recruit others for AmSpec.

28.     Once Davenport, Freeman, and Stair had successfully recruited Saybolt's entire Chevron team, AmSpec induced all of these individuals to resign on the same day.  On September 6, 2016, Freeman announced his resignation from Saybolt, giving two weeks' notice.  Within the same hour, Stair, Lynch, Perry, Sellers, Driskell, and Hoang also announced their resignation.  Still exercising his authority as location manager, Freeman gave all of these departing employees paid time off for the rest of the day.

29.     The sudden departure of all these employees at the same time was not happenstance.  Rather, it was the culmination of AmSpec's plan to raid Saybolt's Chevron team by inducing Davenport, Freeman, and Stair to breach their legal obligations to Saybolt.

30.     Freeman's last actual day to work for Saybolt was on September 14, 2016. The very *next* day, and nine days after the mass resignation announcements had been made, AmSpec publicly announced the opening of its new Mobile facility.  *See* September 15, 2016 AmSpec Press Release, attached as Exhibit D.  In announcing this grand opening, AmSpec CEO Matt Corr touted the "experienced field staff" that AmSpec employed at the new facility.  Corr conveniently did not mention that AmSpec gained this "experienced field staff" by inducing Davenport, Freeman, and

Stair to breach their contractual obligations to Saybolt and by tortiously interfering with Saybolt's business.

31.     This strategy of raiding the employees of established competitors is AmSpec's modus operandi.  For example, as a latecomer to the greater Chicago market in 2014, AmSpec attempted to induce the employees at another competitor in the industry to violate the terms of their non-solicitation agreements, misappropriate trade secrets, and launch a competing office to provide services in the Midwest.  In *Intertek USA, Inc. v. AmSpec, LLC et al.*, No. 14-cv-06160 2014 WL 4477933 (N.D. Ill. Sept. 11, 2014), a judge shut down this attempted coup by temporarily enjoining AmSpec from opening its Chicago office.

32.     AmSpec's plan in Mobile has been successful in damaging Saybolt.  Saybolt has already lost significant business from Chevron because so many employees left at once.  This was exactly the situation that Core Lab's employee agreements with these individuals were designed to prevent.  Saybolt is in the process of mitigating damages by attempting to recruit and train inspectors, laboratory technicians, and schedulers to perform further work for Chevron.  But AmSpec has made this process difficult and expensive, by using Davenport, Freeman, and Stair to induce Saybolt's entire Chevron team to leave suddenly and contrary to many denials by Freeman of the plan.

33.     Defendants' actions have caused irreparable harm to Plaintiffs. Defendants' attempts to "solicit, hire" and "entice away" Plaintiffs' employees have caused Plaintiffs to lose employees with essential qualifications and this has resulted in the loss of business from Chevron and likely will affect other customer relationships.  The loss of Plaintiffs' trade secrets to AmSpec deprives Plaintiffs of their competitive advantage in the market.

34.     Plaintiffs have been required to retain counsel to stop Defendants from continuing to violate employee agreements and damage Plaintiffs' business.

35.     Defendants are all liable for all of these damages and for exemplary damages and attorneys' fees.

## IV.     CAUSES OF ACTION

### Conspiracy – All Defendants

36.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

37.     Defendants conspired with each other to tortiously interfere with Plaintiffs' contracts with Chevron and other customers.

38.     Defendants knew and agreed that the object of their conspiracy was to divert business from Plaintiffs to AmSpec unlawfully.

39.     Defendants enticed away employees from Saybolt, including Lynch, Perry, Sellers, Driskell, and Hoang; Defendants knowingly interfered with Plaintiffs' business relationship with Chevron; and Defendants knowingly interfered with Plaintiffs' goodwill and business opportunities.

40.     Defendants committed these wrongful acts in furtherance of Defendants' conspiracy.

41.     Plaintiffs have suffered damages as a result of Defendants' actions and Defendants are jointly and severally liable for both actual and exemplary damages.

### Agency and Respondeat Superior

42.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

43.     Wherever in this Petition it is alleged that AmSpec did any act or thing, it is meant that AmSpec, itself or by and through agents, officers, servants, employees or representatives did such act or thing, and it was done with the full authorization or ratification of AmSpec or done in

the normal routine, course and scope of the agency or employment of AmSpec or its agents, officers, servants, employees or representatives.

## Tortious Interference with Contracts – AmSpec

44.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

45.     Plaintiffs have ongoing contractual relationships with Davenport, Freeman, Stair, Lynch, Perry, Sellers, Driskell, Hoang, and Chevron.

46.     AmSpec interfered with those relationships by inducing the foregoing employees to breach their employee agreements in order to take business away from Plaintiffs.

47.     As a result, Plaintiffs are entitled to actual damages and punitive damages.

## Tortious Interference with Contracts – Davenport

48.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

49.     Plaintiffs have ongoing contractual relationships with Freeman, Stair, Lynch, Perry, Sellers, Driskell, Hoang, and Chevron.

50.     Davenport interfered with those relationships by inducing these employees to breach their employee agreements in order to take business away from Plaintiffs.

51.     Davenport also sought to, and did, divert Chevron business from Saybolt to AmSpec.

52.     Davenport also sought to, and did, damage Saybolt's business reputation and goodwill.

53.     As a result, Plaintiffs are entitled to actual damages and punitive damages.

## Tortious Interference with Contracts – Freeman

54.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

11

55.     Plaintiffs have ongoing contractual relationships with Davenport, Stair, Lynch, Perry, Sellers, Driskell, Hoang, and Chevron.

56.     Freeman interfered with those relationships by inducing these employees to breach their employee agreements in order to take business away from Plaintiffs.

57.     Freeman also sought to, and did, damage Saybolt's business reputation and goodwill.

58.     These efforts were improper under Freeman's Employee Agreement and under Freeman's common law duties to Plaintiffs and therefore constitute tortious interference with existing contracts.

59.     As a result, Plaintiffs are entitled to actual damages and punitive damages.

**Tortious Interference with Contracts – Stair**

60.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

61.     Plaintiffs have ongoing contractual relationships with Davenport, Freeman, Lynch, Perry, Sellers, Driskell, Hoang, and Chevron.

62.     Stair interfered with those relationships by inducing these employees to breach their employee agreements in order to take business away from Plaintiffs.

63.     Stair also sought to, and did, damage Saybolt's business reputation and goodwill.

64.     These efforts were improper under the Stair Employment Agreement and under Stair's common law duties to Plaintiffs and therefore constitute tortious interference with existing contracts.

65.     As a result, Plaintiffs are entitled to actual damages and punitive damages.

**Breach of Contract – Davenport**

66.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

67.     Davenport's December 8, 1997 Employee Agreement is a valid and enforceable contract under Texas law.  All conditions precedent for the enforcement of this agreement have been satisfied.

68.     Davenport has breached Paragraph 10 of the Davenport Employee Agreement. Under this paragraph, Davenport may not "solicit, hire, or endeavor to entice away any employee of the Company, or knowingly interfere with the business relationship between the Company and any customer" for two years after his employment ends.

69.     Davenport has solicited, hired, and endeavored to entice away Plaintiffs' employees and also has caused Saybolt to lose business from a key customer and suffer damage to its business reputation and goodwill.

70.     Davenport knew that these actions violated his Employee Agreement and were likely to disrupt the Chevron relationship.  Davenport acted with malice.  All of the foregoing misconduct occurred within two years of Davenport's departure from Saybolt.  Discovery is likely to show additional instances of this misconduct by Davenport.

71.     These actions breach the Davenport Employee Agreement and have caused damages to Plaintiffs.

72.     As a result, Plaintiffs are entitled to actual damages, attorneys' fees, and costs of court.

**Breach of Contract – Freeman**

73.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

74.     Freeman's May 28, 1999 Employee Agreement is a valid and enforceable contract under Texas law.  All conditions precedent for the enforcement of this agreement have been satisfied.

75.     Freeman has breached Paragraph 6 of the Employee Agreement.   Under this paragraph, Freeman agreed to "receive and hold [confidential] information in confidence and not disclose to anyone outside of the Company, either while [he was] an employee or thereafter."

76.     Freeman disclosed this confidential information to AmSpec, in breach of the agreement he signed.

77.     Freeman has breached Paragraph 10 of the Employee Agreement.   Under this paragraph, Freeman may not "solicit, hire, or endeavor to entice away any employee of the Company, or knowingly interfere with the business relationship between the Company and any customer" for two years after his employment ends.

78.     Freeman has solicited, hired, and endeavored to entice away Plaintiffs' employees and also has caused Saybolt to lose business from a key customer and suffer damage to its business reputation and goodwill.

79.     Freeman knew that these actions violated his Employee Agreement and were likely to disrupt the Chevron relationship.   Freeman acted with malice.   All of the foregoing misconduct occurred during Freeman's employment at Saybolt or within two years of Freeman's departure. Discovery is likely to show additional instances of this misconduct by Freeman.

80.     These actions breach the Freeman Employee Agreement and have caused damages to Plaintiffs.   Freeman is therefore liable for actual damages and attorneys' fees.

81.     As a result, Plaintiffs are entitled to actual damages, attorneys' fees, and costs of court.

**Breach of Contract – Stair**

82.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

83.     Stair's May 31, 2002 Employee Agreement is a valid and enforceable contract under Texas law.  All conditions precedent for the enforcement of this agreement have been satisfied.

84.     Stair has breached Paragraph 6 of the Employee Agreement.  Under this paragraph, Freeman agreed to "receive and hold [confidential] information in confidence and not disclose to anyone outside of the Company, either while [he was] an employee or thereafter."

85.     Stair disclosed this confidential information to AmSpec, in breach of the agreement he signed.

86.     Stair has breached Paragraph 10 of the Employee Agreement.   Under this paragraph, Stair may not "solicit, hire, or endeavor to entice away any employee of the Company, or knowingly interfere with the business relationship between the Company and any customer" for two years after his employment ends.

87.     Stair has solicited, hired, and endeavored to entice away multiple Core Lab employees and also has caused Saybolt to lose business from a key customer and suffer damage to its business reputation and goodwill.

88.     Stair knew that these actions violated his Employee Agreement and were likely to disrupt the Chevron relationship.  Stair acted with malice.  All of the foregoing misconduct occurred during Stair's employment at Saybolt or within two years of Stair's departure.  Discovery is likely to show additional instances of this misconduct by Stair.

89.     These actions breach the Stair Employee Agreement and have caused damages to Plaintiffs.  Stair is therefore liable for actual damages and attorneys' fees.

90.     As a result, Plaintiffs are entitled to actual damages, attorney's fees, and costs of court.

**Breach of Fiduciary Duty – Freeman**

91.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

92.     As Plaintiffs' employee, Freeman owed a fiduciary duty to Plaintiffs and was obligated to act in Plaintiffs' best interest.

93.     Freeman breached that fiduciary duty by conspiring with other employees of Plaitniffs' business and actively recruiting for a competitor while employed by Plaintiffs.

94.     Freeman's disloyal recruitment has resulted in Plaintiffs' loss of Chevron business as well as damage to Plaintiffs' business reputation and goodwill.

95.     As a result, Plaintiffs are entitled to actual damages and punitive damages.

**Breach of Fiduciary Duty – Stair**

96.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

97.     As Plaintiffs' employee, Stair owed a fiduciary duty to Plaintiffs and was obligated to act in Plaintiffs' best interest.

98.     Stair breached that fiduciary duty by conspiring with other employees of Plaintiffs' business and actively recruiting for a competitor while employed by Plaintiffs.

99.     Stair's disloyal recruitment has resulted in Plaintiffs' loss of Chevron business as well as damage to Plaintiffs' business reputation and goodwill.

100.     As a result, Plaintiffs are entitled to actual damages and punitive damages.

**18 U.S.C. § 1836 Theft of Trade Secrets - AmSpec**

101.      Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

102.     Plaintiffs owned confidential trade secret information about customers, pricing, business strategy, and lab testing procedures that Plaintiffs had taken reasonable efforts to keep secret.

16

103.    This confidential trade secret information related to Plaintiffs' services used in interstate commerce.

104.    Plaintiffs' confidential trade secret information related to customers, pricing, business strategy, and lab test procedures have actual value to third parties.  Plaintiffs invested substantial time to develop relationships with customers in the oil and gas industry.  The customer contacts and pricing information for those customers reflect years of negotiation and collaboration. Plaintiffs further invested time, money, and effort in developing its procedures for testing and analyzing the oil and gas of its customers.  The full extent of the customer contact lists, pricing information, and lab test procedures remained generally unknown or not readily ascertainable to third parties, especially to Plaintiffs' competitors.   Specifically, AmSpec will not have to outlay similar resources to obtain the information that Plaintiffs already developed and maintained, so that information has actual independent value to AmSpec.

105.    AmSpec acquired Plaintiffs' trade secret information after inducing Freeman and Stair to breach their duty to maintain the confidentiality of the information to which Freeman and Stair had access.  Freeman and Stair then downloaded the confidential customer contact lists, pricing information, and lab tests procedures from Plaintiffs' servers and made this information available to AmSpec.  AmSpec knew, or should have known, that his was an improper means to acquire the information.

106.    AmSpec's trade-secret misappropriation has directly resulted in Plaintiffs' actual loss of Chevron business, damage to Plaintiffs' business reputation and goodwill, and the unjust enrichment of AmSpec.

107.    As a result, Plaintiffs are entitled to actual damages, punitive damages, attorneys' fees, and costs of court.

## 18 U.S.C. § 1836 Theft of Trade Secrets – Freeman and Stair

108.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

109.     Plaintiffs owned customer contact lists, pricing information, and lab test procedures that it had taken reasonable efforts to keep secret by entering into confidentiality agreements with employees.

110.     Plaintiffs' customer contact lists, pricing information, and lab test procedures have actual value to third parties.  Plaintiffs invested substantial time to develop relationships with customers in the oil and gas industry.  The customer contact lists and pricing information for those customers reflect years of negotiation and collaboration.  Plaintiffs further invested time, money, and effort in developing its procedures for testing and analyzing the oil and gas of its customers. The full extent of the customer contact lists, pricing information, and lab test procedures remained generally unknown or not readily ascertainable to third parties, especially to Plaintiffs' competitors.   Specifically, AmSpec will not have to outlay similar resources to obtain the information that Plaintiffs already developed and maintained, so that information has actual independent value to AmSpec.

111.     Freeman and Stair acquired Plaintiffs' trade secret information after breaching their duty to maintain the confidentiality of the information to which Plaintiffs gave them access. Freeman and Stair then downloaded the confidential customer contact lists, pricing information, and lab tests procedures from Plaintiffs' servers and disclosed this information to AmSpec. Freeman and Stair knew, or should have known, that his was an improper means to acquire and disclose the information.

112.     Freeman and Stair's trade-secret misappropriation has directly resulted in Plaintiffs' actual loss of Chevron business, damage to Plaintiffs' business reputation and goodwill,

and the unjust enrichment of AmSpec.

113.    As a result, Plaintiffs are entitled to actual damages, punitive damages, attorneys' fees, and costs of court.

**Trade Secret Misappropriation – AmSpec**

114.    Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

115.    Plaintiffs owned customer contact lists, pricing information, and lab test procedures that it had taken reasonable efforts to keep secret by entering into confidentiality agreements with employees.

116.    Plaintiffs' customer contact lists, pricing information, and lab test procedures have actual value to third parties.  Plaintiffs invested substantial time to develop relationships with customers in the oil and gas industry.  The customer contact lists and pricing information for those customers reflect years of negotiation and collaboration. Plaintiffs further invested time, money, and effort in developing its procedures for testing and analyzing the oil and gas of its customers. The full extent of the customer contact lists, pricing information, and lab test procedures remained generally unknown or not readily ascertainable to third parties, especially to Plaintiffs' competitors.   Specifically, AmSpec will not have to outlay similar resources to obtain the trade secret information that Plaintiffs already developed and maintained, so that information has actual independent value to AmSpec.

117.    AmSpec acquired Plaintiffs' trade secret information after inducing Freeman and Stair to breach their duty to maintain the confidentiality of the information to which Freeman and Stair had access.  Freeman and Stair then downloaded the confidential customer contact lists, pricing information, and lab tests procedures from Plaintiffs' servers and made this information available to AmSpec.  AmSpec knew, or should have known, that his was an improper means to

acquire the information.

118.     AmSpec's trade-secret misappropriation has directly resulted in Plaintiffs' actual loss of Chevron business, as well as the unjust enrichment of AmSpec, Freeman, and Stair.

119.     As a result, Plaintiffs are entitled to actual damages, punitive damages, attorneys' fees, and costs of court.

### Trade Secret Misappropriation – Freeman and Stair

120.     Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

121.     Plaintiffs owned customer contact lists, pricing information, and lab test procedures that it had taken reasonable efforts to keep secret by entering into confidentiality agreements with employees.

122.     Plaintiffs' customer contact lists, pricing information, and lab test procedures have actual value to third parties.  Plaintiffs invested substantial time to develop relationships with customers in the oil and gas industry.  The customer contact lists and pricing information for those customers reflect years of negotiation and collaboration. Plaintiffs further invested time, money, and effort in developing its procedures for testing and analyzing the oil and gas of its customers. The full extent of the customer contact lists, pricing information, and lab test procedures remained generally unknown or not readily ascertainable to third parties, especially to Plaintiffs' competitors.   Specifically, AmSpec will not have to outlay similar resources to obtain the trade secret information that Plaintiffs already developed and maintained, so that information has actual independent value to AmSpec.

123.     Freeman and Stair acquired Plaintiffs' trade secret information by breaching their duty to maintain the confidentiality of the information to which Plaintiffs gave them access in trust. Freeman and Stair then downloaded the confidential customer contact lists, pricing information,

and lab tests procedures from Plaintiffs' servers and made this information available to AmSpec. Freeman and Stair knew, or should have known, that this was an improper means to acquire and disclose the confidential information.

124.    Freeman and Stair's trade-secret misappropriation has directly resulted in Plaintiffs' actual loss of Chevron business, as well as the unjust enrichment of AmSpec, Freeman, and Stair.

125.    As a result, Plaintiffs are entitled to actual damages, punitive damages, attorney's fees, and costs of court.

### V.    APPLICATION FOR TEMPORARY RESTRAINING ORDER

126.    Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

127.    For the reasons set forth above, Plaintiffs have a probable right to relief on its tortious interference, breach of contract, breach of fiduciary duty, and trade-secret misappropriation claims.

128.    Defendants have successfully recruited at least five other employees away from Plaintiffs by inducing Plaintiffs' employees to violate their fiduciary and contractual duties. Defendants have attempted to recruit other employees and are likely seeking to entice away further customers.

129.    Defendants have misappropriated trade secrets and now unjustly enrich themselves off their unlawful use.

130.    Because of these actions, Plaintiffs face a risk of imminent and irreparable harm and have no adequate remedy at law.  Plaintiffs are unlikely to be able to recover business and employees after Defendants have successfully recruited them for AmSpec.

131.    This Court should grant a temporary restraining order to stop Defendants from contacting Plaintiffs' customers or employees and from attempting to "solicit, hire, or endeavor to entice away any employee of the Company, or knowingly interfere with the business relationship between the Company and any customer."

132.    This Court should further grant a temporary restraining order to prevent Defendants from continuing to unlawfully possess, use, or disclose Plaintiffs' trade secrets.

133.    This temporary restraining order is necessary to enforce the terms of the Former Employees' employee agreements and to prevent irreparable harm to Plaintiffs.

134.    Plaintiffs will post a reasonable bond, which should not exceed $100.00.

## VI.    APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

135.    Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

136.    For the reasons set forth in the sections above, Plaintiffs are entitled to a temporary and permanent injunction to stop Defendants from contacting Saybolt customers or employees, from attempting to "solicit, hire, or endeavor to entice away any employee of the Company, or knowingly interfere with the business relationship between the Company and any customer," and from using and disclosing Plaintiffs' trade secrets.

137.    Plaintiffs are also entitled to a temporary and permanent injunction to prevent Defendants from continuing to unlawfully possess, use, or disclose Plaintiffs' trade secrets.

138.    This injunctive relief is necessary to enforce the terms of the Former Employees' employee agreements and to prevent irreparable harm to Plaintiffs.

## VII.    REQUEST FOR PRESERVATION

139.    Plaintiffs request that Defendants preserve all documents, electronic or otherwise, that pertain to the matters addressed in this petition and to not discard, destroy or conceal such documents from this point forward.

## VIII.   CONDITIONS PRECEDENT

140.    Plaintiffs repeat the foregoing paragraphs as if fully set forth here.

141.    All conditions precedent, if any, to Plaintiffs' right to recover as alleged herein have been performed, have occurred, or have been waived.

## IX.    JURY DEMAND

142.    Plaintiffs demand a trial by jury on all issues so triable and has paid the required jury fee.

## X.    PRAYER

For the reasons set forth above, Plaintiffs Core Laboratories LP and Saybolt LP request that the Court, after a trial on the merits, award Plaintiffs a judgment against Defendants AmSpec, LLC, Bobby Davenport, Hugh Freeman, and Travis Stair, compensatory damages, exemplary damages, attorneys' fees, costs of court, a temporary restraining order, temporary injunction, permanent injunction, and all other relief, general and special, to which Plaintiff is entitled in equity and in law.

Respectfully submitted,

ADAMS AND REESE LLP

/s/  Matthew R. Jackson
JANNEA S. ROGERS (ROGE7403)
MATTHEW R. JACKSON (JACKM7882)
11 North Water Street, Suite 23200
Mobile, Alabama 36602
Tel: (251) 433-3234
Facsimile:  (251) 438-7733

jannea.rogers@arlaw.com
matt.jackson@arlaw.com

AHMAD,   ZAVITSANOS,   ANAIPAKOS,   ALAVI   &
MENSING P.C.

Steven J. Mitby (*pro hac vice* admission to be sought)
State Bar No. 24037123
Nathan Campbell (*pro hac vice* admission to be sought)
State Bar No. 24097455
1221 McKinney, Suite 3460
Houston, Texas 77010
Tel: (713) 655-1101
Facsimile: (713) 655-0062
smitby@azalaw.com
ncampbell@azalaw.com

**COUNSEL   FOR   PLAINTIFFS   CORE
LABORATORIES LP, and SAYBOLT LP**

4810-8302-2649, v. 15-8302-2649, v. 11