IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CORE LABORATORIES LP F/K/A, | § | |
| CORE LABORATORIES, INC.; AND | § | |
| SAYBOLT LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 16-cv-526 |
| v. | § | |
| | § | |
| AMSPEC, LLC; BOBBY DAVENPORT; | § | |
| HUGH FREEMAN; AND TRAVIS | § | |
| STAIR, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE TESTIMONY AND PRELIMINARY EXPERT REPORT OF PLAINTIFFS' EXPERT WITNESS JEFFERY A. COMPTON

Defendants AmSpec, LLC ("AmSpec"), Bobby Davenport, Hugh Freeman and Travis

Stair file this motion to strike Jeffery A. Compton, Saybolt's Expert in the above-styled matter,

and would respectfully show as follows:

## I.
## INTRODUCTION

On October 7, 2016, Saybolt filed the present lawsuit against AmSpec, along with Bobby

Davenport, Hugh Freeman, and Travis Stair ("Individual Defendants"). The lawsuit arose out of

AmSpec's opening of an office in Mobile, AL, and the hiring of eight employees from Saybolt.

Saybolt has alleged causes of action against AmSpec for misappropriation of trade secrets under

both Alabama law and the Federal Defend Trade Secrets Act (18 USC § 1836), along with claims

of conspiracy and tortious interference with Saybolt's contractual relationships with its employees

and Chevron, one of its customers. Saybolt has also alleged causes of action against the Individual

Defendants, to include tortious interference, breach of contract, conspiracy, and, with relation to Defendants Freeman and Stair, breach of fiduciary duty and misappropriation of trade secrets.

Saybolt claims that it is entitled to damages exceeding $1,000,000 as a result of AmSpec's lawful hire of personnel in Mobile and AmSpec's lawful competition in the marketplace. Saybolt has identified Jeffrey A. Compton ("Compton") as its expert witness to support its purported damages. This Court should strike Compton's report and his testimony as he does not meet the standards for expert testimony under Federal Rules of Civil Procedure 702 and 703 or *Daubert* for multiple reasons. First, Compton's "preliminary" report wholly fails to comply with Federal Rule of Civil Procedure 26(e). Compton repeatedly admitted in his deposition that his report was not complete, but never supplemented his report during the discovery period. Saybolt clearly should not be able to supplement its expert's report on the eve of trial, as that would be highly prejudicial to Defendants. Equally certain, Saybolt should not be able to introduce into evidence a report that is admittedly incomplete, especially where Compton used that fact as an excuse to refuse to answer questions in his deposition.

Second, even if Compton's report were somehow admissible under Rule 26(e), his methodology is not reliable and fails the test for admissibility of expert opinions. Compton opines that Defendants are somehow responsible for *all* $1.286 million of Saybolt's alleged lost profits during the two-year period after AmSpec opened a Mobile office.

But, Compton's report and testimony is not only riddled with fatal methodological flaws, it represents a fundamental misrepresentation of how competitive markets work, which fails the *Daubert* test. Instead of evaluating the multitude of factors that may have played a role in Saybolt's declining profits, and scientifically separating out any losses that are attributable to the alleged unlawful conduct – Compton blames all of Saybolt's decline in business on Defendants. For

example, to the extent Compton even tries to delineate a cause for the decline, Compton speculates that one primary factor—eight Saybolt employees leaving to go work for AmSpec—led to Saybolt's lost profits.  Compton's "expert" opinion is comparable to blaming **all** of the lost profits of a McDonald's location on the loss of employees who jump ship when a Burger King opens next door.  As a matter of law, AmSpec has a right to hire Saybolt's employees (and they have a corresponding right to quit Saybolt) and to open up an office in Alabama.  Compton has done nothing to distinguish any losses that would occur from this lawful competition.  This is a fatal flaw.

In sum, Compton's report is improperly simplistic and based on nothing but speculation and conjecture. Indeed, Compton conceded in deposition that his entire report is based on his own speculation that Saybolt would have retained 100% of its Chevron work with no consideration to AmSpec's lawful competition, market forces, or the three other competitors competing in the market for the same Chevron work.  This speculation has been rebutted by the testimony of lay witnesses, including Saybolt's corporate representative.   Accordingly, Compton's report and testimony must be stricken from this case.

## II.
## ARGUMENT & AUTHORITIES

### A.    Standard of Review

The law is clear that Saybolt bears the burden of proving that Compton's report and testimony are properly before this Court: "the burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th

Cir.1999)); *see also Hendrix ex. Rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010).

Admissibility of experts under Rule 702 is a three part inquiry: the district court must consider whether (1) "the expert is qualified to testify competently regarding the matters he intends to address," (2) "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)," and (3) "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). In other words, Saybolt must establish that (1) Compton is qualified to opine as an expert on damages associated with Saybolt's claims; (2) his proposed testimony is reliable; and (3) his proposed testimony is relevant and helpful.

The district court must act as a gatekeeper to ensure that Rule 702's requirements are met. *Daubert*, 509 U.S. at 589. The Court's gatekeeping role is meant "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.")(citing Fed.R.Evid. 702 advisory committee notes). Expert testimony is *only admissible* when: (1) the expert is qualified to testify competently; (2) the methodology used by the expert to reach his conclusion is sufficiently reliable as determined under the *Daubert* standard; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine an issue of fact. *Daubert*, 509 U.S. at 591-95; *see also Allison*, 184 F.3d at 1309 (affirming exclusion of experts).

Here, Saybolt cannot meet its burden because, as detailed below, Compton's "Preliminary Expert Report" does not even comply with Rule 26's baseline requirements for admissibility. Moreover, Compton's methodology is unreliable and his opinions amount to nothing more than speculation which will not assist the trier of fact in determining Saybolt's damages. Therefore, Compton should be stricken as an expert witness in this case, and neither his report nor his testimony should be admitted at trial.

**B.**    **Compton's Preliminary Expert Report is Incomplete Pursuant to Rule 26.**

As an initial matter, Compton has not supplemented his "Preliminary Expert Report." It is therefore inadmissible and the Court need read no further to deny his ability to testify. Plaintiff first disclosed Compton's "Preliminary Expert Report" on May 19, 2017. (Ex. 1, Saybolt Disclosure of Expert Witnesses). In his Preliminary Report, Compton stated, that his "assessment of the Plaintiffs' economic losses is preliminary as discovery is ongoing." (Ex. 2, Compton's Preliminary Report at p. 1). Similarly, during his deposition on July 20, 2017, Compton repeatedly stated he would supplement or amend his report based on additional information produced or reviewed. (Ex. 3, Compton's Depo. at 92:7-12; 92:19-24; 93:24-94:2; 96:11-13; 97:19-22; 98:4-8; 181:24-182:3). However, despite the production of additional information, and nine months since his deposition, Compton has failed to supplement his Preliminary Report at any point in time.

Pursuant to Rule 26(e), an expert has a duty to timely supplement his report when new information becomes available. Fed.R.Civ.P. 26 (e); *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (finding district court did not err in striking expert who did not timely supplement report despite opportunities to do so and with no good excuse for failure). Rule 26(e) requires a party to supplement or correct disclosure by the time the party's pretrial disclosures under Rule 26(a)(3) are due; however, that provision does not license parties to freely circumvent deadlines established in the Court's scheduling orders." *Bryther v. City of Mobile*, Case No. 04-

00404-CG-B, 2005 WL 1588223, *1 (S.D. Ala. June 17, 2005); *Romero v. Drummond Co*., 552 F.3d 1303, 1324 (11th Cir. 2008). "To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given." *Id*. (citing *Beler v. United States of America*, 221 F.R.D. 689, 695 (D.N.M. 2003)).  If a party fails to timely supplement, then that party may not use any such additional or corrective information to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. Fed.R.Civ.P. 37(c)(1); *Pivac v. Component Servs. & Logistics, Inc.*, 570 F. App'x 899, 901 (11th Cir. 2014)

Without supplementation, Compton's Preliminary Report is incomplete and inadequate under Rule 26 as a matter of law and supplementing at Trial is too late and would be unduly prejudicial.  Indeed, multiple times during his deposition, Compton admitted his Report failed to consider necessary information that had not yet been produced. (Ex. 3 at 92:7-12; 92:19-24; 93:24-94:2; 96:11-13; 97:19-22; 98:4-8; 181:24-182:3).  For example, at the time of his deposition, Compton was unable to reconcile why his Chevron and non-Chevron sales did not total all sales—leading to a discrepancy of nearly $200,000 each year.  (Ex. 3 at 91:13-93:21).  Similarly, although he stated it would be important to supplement his report with the breakdown of Chevron and non-Chevron work after September 2016, he failed to do so.  (Ex. 3 at 96:7-17).  Notably, Compton's report states that he was "still studying the relationship between the Chevron and non-Chevron revenue." (Ex. 2 at p. 3).  Compton wants to have his cake and eat it too, by refusing to answer questions in his deposition and characterizing all of his opinions as "preliminary," and then reserving the right to change everything at trial.  The Federal Rules of Civil Procedure do not allow this type of gamesmanship.

Expert reports must be detailed and complete, and not sketchy, vague or preliminary in nature. Fed. R. Civ. P. 26 advisory committee's note; *In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23493-CIV, 2011 WL 13174537, at *3 (S.D. Fla. Nov. 17, 2011); *Dyett v. N. Broward Hosp. Dist., No. 03-60804-CIV, 2004 WL 5320630, at *1 (S.D. Fla. Jan. 21, 2004)*. In fact, many courts have determined that "preliminary" reports do not comply with Rule 26(a)(2)(B). *See Acosta v. Electrolux N. Am.*, No. 08-60213-CIV, 2008 WL 5246160, at *5 (S.D. Fla. Dec. 16, 2008) ("[A] 'preliminary report' does not suffice under Rule 26."); *Smith v. State Farm Fire and Cas. Co.*, 164 F.R.D. 49, 53 (S.D. W. Va. 1995) ("A 'preliminary' report is not contemplated by the Rule, which calls for "a complete statement of all opinions to be expressed."); *Hallmark Developers, Inc. v. Fulton County, Georgia*, 2004 WL 5492706 *6 (N.D.Ga. Sept.27, 2004) (finding requirements of Rule 26 not met where reports required "further revision and analysis"); *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 743 (7th Cir. 1998); *Smith v. State Farm Fire and Casualty Co.*, 164 F.R.D. 49, 53 (S.D.W.Va.1995) ("[a] 'preliminary' report is not contemplated by the Rule [26]...").

Accordingly, Compton's report and testimony must be stricken for failing to comport with Rule 26. *See id*. In the alternative, Compton must be prohibited from relying on any opinions outside of his preliminary report. *See Salgado*, 150 F.3d at 742 n.6. "If the expert's report contains only incomplete opinions, the court may choose to restrict the expert's testimony to those opinions alone." *Id.*; *In re Fla. Cement & Concrete Antitrust Litig.*, No. 09-23493-CIV, 2011 WL 13174537, at *10 (S.D. Fla. Nov. 17, 2011). As illustrated below, there is no other basis upon which Compton could testify and satisfy the requirements of *Daubert*.

C.     **Compton's Methodology is Unreliable.**

Even if Compton's "Preliminary" report survives the Rule 26(e) problem, it still fails to pass muster under *Daubert*.  The unreliability of Compton's methodology is demonstrated by one simple fact: no matter what evidence is presented at trial—no matter how many or how few claims against the Individual Defendants or AmSpec are found to have any merit—Compton's opinion on damages does not change.  In all instances, Compton believes Defendants must pay Saybolt all $1.286 million of its alleged lost profits.  Compton's one-dimensional, bare bones analysis is not linked in any meaningful way to the alleged wrongful conduct of Defendants, much less the actual admissible evidence in the case.  And, in reaching his simplistic conclusion, Compton impermissibly ignores alternative theories of why Saybolt's profits declined and relies on provably false statements to support his opinion.

Defendants are not arguing that Compton must opine on causation – clearly he cannot and should not do so.  For Compton's opinions to be admissible, however, there must be some relevance of his opinions to the damages that would flow from the alleged misconduct, if proven. Here, Compton's assumption of "proximate cause" is based merely on AmSpec opening an office and hiring Saybolt's employees (Ex. 2 at p. 8, ¶ 19).  The jury does not need an expert to explain that losing employees and having a new competitor come to town means less profits. Those facts are not disputed and Plaintiff must prove much more to prevail at trial than merely being the victim of competition.

1.    **Compton's report wholly fails to consider all of the lawful reasons Saybolt may have lost profits.**

Compton's opinion is based on the faulty assumption that the *only reason* Saybolt suffered $1.286 million in lost profits is because eight former employees resigned to go with AmSpec—without considering all of the lawful reasons Saybolt's profits may have decreased.[1]

For example, Compton failed to consider whether Saybolt's profits simply went down because Saybolt's competitor—AmSpec (engaging in lawful competition)—opened a business in the area. Surely, some, if not all, of Saybolt's profits would have declined simply because AmSpec expanded into the Mobile market. While Compton himself agrees this is a generally accepted principle that a business's profits will decline when a competitor opens up in the area, he fails to attribute any degree of decline in Saybolt's revenues due to AmSpec's mere opening. (*See* Ex. 3 at 218:7-15). This is contrary to the testimony of Saybolt's corporate representative, who acknowledged that multiple inspection companies service the Mobile market, and AmSpec's opening an office in Mobile simply meant that there was a fifth inspection company with whom Chevron and other customers' work would be divided.

Similarly, Compton failed to consider whether AmSpec's preexisting relationship with Chevron, its reputation in the industry, or its increased marketing efforts contributed to the Chevron work AmSpec received. By that same token, he also failed to consider whether Saybolt's

---

[1] This is not the first time a court has found Compton's methodology flawed or unreliable. (*See* Ex. 3 at 42:11 – 15) ("Q: Have you ever been excluded by the court as a witness, as an expert witness? A: Partially, at times, yes. Q: How many times? A: Several."); *See, e.g.*, *W & T Offshore, Inc. v. Apache Corp.*, No. CIV.A. H-11-2931, 2014 WL 1600540, at *1 (S.D. Tex. Apr. 21, 2014) (excluding two of Compton's opinions on damages because of faulty methodology.); *Bourret v. Aspect Energy, LLC*, No. 1:12-CV-03320, (D. Colo. April 22, 2014) (excluding Compton's testimony in part); *Rhymes v. Filter Res., Inc.*, No. 09-14-00482-CV, 2016 WL 5395548, at *9 (Tex. App.—Beaumont Sept. 22, 2016) (*opinion withdrawn and set aside in accordance with parties' agreement*), No. 09-14-00482-CV, 2016 WL 6809251 (Tex.App.-Beaumont Nov. 17, 2016) ("Although Compton testified that he used standard methodology for calculating Filter's lost profits over a five-year period, the assumption he used . . . was speculative.")

relationships, its reputation, or its comparative marketing efforts, led to a decline in Chevron work. (Ex. 3 at 188:10-15).

In fact, at the time his deposition, Compton did not even know that during the relevant time period after September 2016, Saybolt had closed its entire West Coast operations, including three offices. (Ex. 4, Cowan Depo. at 47:11-20); (Ex. 3 at 188:10-189:3).

> Q: Do you know if Saybolt has closed down offices in the United States in the last six months?
>
> A: I don't know.
>
> Q: Do you know if Saybolt has a poor reputation in the industry in the last, say, one to two years?
>
> A: I don't know.
>
> Q: Wouldn't that be important in your lost profit analysis?
>
> A: You know, again, I appreciate, you, know that I'm the second guy up, and there have been no fact witnesses. So a lot of the questions you ask me seem to relate to things that may come up in this case. **<u>I was required to do a report as of a certain date. I didn't have the benefit of any discovery</u>**. As people testify about reputation of Core Labs, other factors for the loss of Chevron, I'll certainly incorporate those as appropriate, but I haven't had the benefit of seeing any of that at this point.

(*Id.*) This is significant because it is undisputed that in the industry, customers prefer to have the same inspection company on both the loading and discharge because it minimizes the chances of a disagreement between inspection companies. (Ex. 5, Thieler Depo. at 110:3-10); (Ex. 6 at 59:23-25); (Ex. 4 at 49:10-17). Clearly, it would have been important for Compton to consider how Saybolt's loss of its coverage for half of the United States coastline, and the corresponding decreased network, impacted its ability to get work on a national level, as well as the reputational impact it played on getting Chevron work (a company headquartered in San Ramon, California).

Yet, Compton fails to consider this factor at all, and despite ample opportunity to supplement his report, he did not do so.

Further, although he concedes it is not a zero sum game; Compton does not know what business lost by Saybolt may have been caused by other competitors, including SGS, Intertek, or Inspectorate. (Ex. 3 at 62:3-11). Despite attributing all of AmSpec's success in the Mobile market due to the "Chevron customer relationships" of the eight departing employees, Compton does not even know what, if any, business relationships Saybolt's new hires had with Chevron. (Ex. 3 at 155:15-156:20). Within weeks, Saybolt hired an entire team of new personnel (from a competitor SGS) to replace those that chose to leave to work at AmSpec. Potentially, Saybolt's new hires had comparable or greater Chevron customer relationships. Without considering all of the above pertinent information, Compton self-servingly opines that he "[hasn't] seen <u>anything</u> that indicates there are factors other than hiring these employees caused the Saybolt revenues to go down." (Ex. 3 at 218:7-220:1).

These failures render Compton's methodology for determining damages unreliable. For example, in *Whitby LLC v. Infinity Radio, Inc.,* the court ruled that the trial court erred in permitting the jury to consider an expert's testimony, where the expert failed to consider external variables contributing to lost revenues, and instead, solely blamed all lost revenue on an employee's breach of her noncompete. 951 So.2d 890, 900 (Fla. 4th DCA 2007). Specifically, in this case, a radio station brought suit against a former on-air personality for breach of a one-year non-compete agreement and against the subsequent employer for tortious interference with that contract. *Id.* at 892-96. The court found that the expert's methodology was speculative and unreliable because the expert failed to consider a number of lawful external factors which could have affected the radio station's revenue. *Id.* at 898-99. In reaching its holding, the court explained that "the

speculative and conjectural nature of [the expert's] methodology, combined with the numerous critical variables he failed to consider" made it difficult for a trier of fact to determine that the lost profits were a direct result of the employee's action, or that the amount of lost profits was determined with reasonable certainty. *Id.*

Similarly, several other courts have found that an expert's failure to consider relevant variables in a lost profit analysis renders the expert's methodology unreliable under *Daubert*. See, e.g., *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 177 (S.D.N.Y. 2006) (excluding proffered expert testimony where expert did not quantify losses resulting from any stigma, and failed to account for other factors that might have caused decline in business.); *Snac Lite, LLC v. Nuts 'N More, LLC*, No. 2:14-CV-01695-RDP, 2016 WL 6778268, at *7 (N.D. Ala. Nov. 16, 2016) (excluding expert because expert failed to analyze relevant factors, including the market and plaintiff's marketing strategy, before making the conclusory opinion that defendant's alleged misrepresentations caused plaintiff's lost profits.); *3M Innovative Properties Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 973 (D. Minn. 2005) (finding expert simply calculated damages after assuming defendant's alleged conduct caused plaintiff's lost profits, and noting that it failed to provide any insight or evidence into causation because the expert failed to account for other factors that could have contributed to plaintiff's lost profits.); *Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C.*, 436 S.W.3d 9, 18-22 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (finding expert testimony insufficient to support a finding that defendant's misappropriation of trade secrets proximately caused plaintiff to sustain lost profit damages, where expert failed to consider how lawful aggressive competition factored into lost profit analysis.); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 442 (D.N.J. 2009) (excluding expert because he failed to take into account numerous relevant factors as to causation, rendering

12

his opinion unreliable).  Although "an expert need not consider every possible factor . . . the district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355–56 (Fed. Cir. 2005) (affirming district court's decision to exclude expert who failed to consider significant factors that may have contributed to the proffered loss).

Like the expert in the cases above, Compton has entirely failed to consider all of the numerous lawful factors which may have contributed to Saybolt's decline in profits.  Without such a consideration, Compton's methodology is unreliable and cannot aid a trier of fact in determine the cause or amount of lost profits with any degree of reasonable certainty.  Accordingly, Compton's testimony must be excluded.

### 2.   Compton bases his opinion on false assumptions regarding AmSpec's relationship with Chevron.

Compton's entire report is premised on the false assumption that "AmSpec did not have local customer relationships except through the employees subject to agreements with Saybolt." (Ex. 2 at p. 8).  When asked during his deposition how he got to this assumption, all Compton was able to point to was "AmSpec's press announcement where they said that they were commencing inspection and testing services in Mobile" and the conclusory assumption that because "they weren't in the market, so they couldn't have local customer relationships."  (Ex. 3 at 166:16-167:10).  Remarkably, Compton didn't even know, or consider, the undisputed facts in this case reflecting that Chevron was a large customer of AmSpec for years before it opened a Mobile office. To suggest that every dollar that goes to AmSpec from Chevron in Mobile is somehow damages of Saybolt in this case is patently absurd and reflects zero understanding of lawful competition and economics.

As already briefed at length to this Court, AmSpec had a strong customer relationship with Chevron prior to opening a Mobile, Alabama office.  (Ex. 6, Vella Depo. at 13:9-14:5).  AmSpec

had been marketing Chevron schedulers in Houston for work in Pascagoula since at least 2010 (*Id.*).   AmSpec had a dedicated Global Account Manager for Chevron in Houston who has managed the AmSpec Chevron team since March 2015.   (Ex. 9, Lowell Depo. at 4:24-25; 6:12-17; 18:11-16).   Indeed, AmSpec regularly received nominations from Chevron schedulers before it had an office in Mobile and Chevron schedulers and planners told AmSpec on multiple occasions that they wanted AmSpec to open up a Mobile office so they could give work to AmSpec from the Pascagoula refinery.   (Ex. 5 at 23:7-24:16; Ex 4 at 16:11-21).

Despite overwhelming evidence to the contrary, Compton bases his opinion on the <u>false</u> assumption that AmSpec had no customer relationship with Chevron, rendering his conclusions unreliable.   See *Finestone v. Fla. Power & Light Co.*, No. 03-14040-CIV, 2006 WL 267330, at *13 (S.D. Fla. Jan. 6, 2006), *aff'd,* 272 F. App'x 761 (11th Cir. 2008) (dismissing experts because their "false assumptions make their methodology unreliable."); *Ferguson v. Bombardier Services Corp.,* 244 Fed. Appx. 944, 949 (11th Cir.2007) (finding that the district court properly excluded the expert's testimony because it was predicated on a false assumption (that an aircraft was properly (versus improperly) loaded) when such an assumption was belied by the evidence); *Phillips,* 238 Fed. Appx. at 540 (affirming the district court's exclusion of expert testimony where the expert provided no reliable link between his data and the facts at issue in the case); *McDowell,* 392 F.3d at 1301 (concluding that substantial evidence supported the district court's exclusion of an expert's testimony because the expert's methodology was unreliable given that he produced dissimilar facts and thus no reliable link between his data and the facts in the case); *Bloodsworth v. Smith & Nephew, Inc.,* 476 F.Supp.2d 1348, 1354–1355 (M.D.Ala.2006) (concluding that an expert's testimony was due to be excluded because it was conclusory and devoid of any factual support). As such, Compton's opinion and report must be excluded.

D.     **Compton's Report is Pure Guess Work, and It Will Not Aid a Trier of Fact.**

Finally, *Daubert* is clear that expert witness testimony must assist the trier of fact, **through**
**the application of scientific, technical, or specialized expertise**, to understand the evidence or
determine an issue of fact. *Daubert*, 509 U.S. at 591-95 (emphasis added).  Compton's report and
deposition testimony make clear that nothing in his opinions would assist the trier of fact to decide
whether Defendants should be held responsible for any economic losses suffered by Saybolt.
Compton conceded as much:

> Q: It's not a zero sum game; correct? In other words, the business that's lost by Saybolt
>
> doesn't all necessarily go to AmSpec, it could go to other competitors; correct?
>
> A: That's possible.  I don't know what business went to AmSpec.
>
> Q: Or SGS, or Intertek, or Inspectorate for that matter; right?
>
> A: Right.

(*See* Ex. 3 at 62:3-11).

The law is clear: recovery of lost profits will not be allowed where the facts show that the
profits claimed are too uncertain or speculative.  *Brough v. Imperial Sterling, Ltd.*, 297 F.3d 1172,
1179 (11th Cir. 2002) (recognizing that damages may not be awarded when they are dependent on
a party taking an action that it is unclear he would have taken); *Fid. Warranty Servs., Inc. v.*
*Firstate Ins. Holdings, Inc.*, 74 So. 3d 506, 514 (Fla. 4th DCA 2011) (affirming exclusion of expert
opinion because it was an inappropriate use of "purely speculative forecasts of future revenue");
*Fla. Sunrise v. Tri-M Invs.*, 942 So. 2d 421, 424 (Fla. 4th DCA 2006) (explaining that unsupported
projections about prospective business extensions should not be considered); *KW Plastics v.*
*United States Can Co,* 131 F. Supp. 2d 1289 (M.D. Ala. 2001) (excluding damages expert in trade
secrets case based on *Daubert*); *Nilssen v. Motorola, Inc.,* 1998 WL 513090 (N.D. Ill. Aug. 14,
1998) (applying *Daubert* to exclude testimony of damages expert in trade secret case). Without

objective facts, figures, and data from historical profitability, or evidence establishing the existence of future contracts, damages for lost profits are mere speculation. *See Allied Bank West Loop, N.A. v. C.B.D. & Assoc., Inc.*, 728 S.W.2d 49, 55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

Here, it is undisputed that Chevron was not bound to continue to do business with Saybolt, or any inspection company for that matter. (Ex. 3 at 213:21-24). Indeed, Saybolt's contract with Chevron specifically disclaims any guarantee of business. (Doc. 209-32 Section 2.1) ("[N]othing herein shall obligate Chevron to order Services from Contractor in any portion or amount or prevent Chevron from procuring Services from any other contractors."). Yet, Compton bases his entire report on the entirely speculative and uncertain opinion that Saybolt would have continued to receive Chevron work at the same rate, even though one of its largest competitors (AmSpec) had opened up in the area, Saybolt closed down half of its offices in the United States, and a myriad of other factors that affect competition. (Ex. 2 at p. 8). Such a simplistic analysis is nothing more than self-serving speculation – not scientific based opinion.

The glaring holes in Compton's testimony are too numerous to mention, but Defendants will highlight the readily obvious ones. First, Compton never bothered to look at how much of Saybolt's supposed "lost profits" actually went to AmSpec. There are five inspection companies competing for Chevron's work, not just AmSpec and Saybolt. AmSpec likely took work from all competitors, not just Saybolt. In any time period, the relative percentages of work could rise and fall for legitimate business reasons. Compton did none of this analysis. Compton also failed to look at the overall market for inspection services during the relevant time period – did all of the inspection companies who did work for Chevron experience a drop in profitability? Did the price of oil go up or down? Again, Compton's "analysis" ignores the basic principles of economics.

16

Further, because Compton fails to specifically delineate how Saybolt's alleged damages are attributable to any particular wrongful act, Compton's report cannot aid the trier of fact. For example, the damages associated with alleged misappropriation of a trade secret are necessarily different from the alleged violation of an employment agreement.  Further, Compton's analysis revolves around the false assumption that AmSpec did not have a right to hire the eight employees from Saybolt, and that all business losses associated with this turnover are recoverable.  Notably, Compton failed to account for the fact that these employees were replaced by individuals who had equal relationships with Chevron.  (Ex. 3 at 155:15-156:20); (Ex. 7, Hunt Depo. at 12:16-18; 14:4-6; 14:19-15:5); (Ex. 8, Ramirez Depo. at 18:1-5; 145:  12-24).

To the extent the Court disallows any such arguments, or dismisses such claims as a matter of law, Compton's report instantly becomes inadmissible.  *See*, *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007) (finding expert report was properly rejected as evidence of damages, where expert was unable to separate what, if any, portion of damages were attributable to the torts that survived summary judgment).

Accordingly, Compton's analysis is too uncertain and speculative to support a claim for lost profits, and his conjecture cannot aid a trier of fact and would likely confuse the jury resulting in substantial prejudice to some or all of the Defendants, in contravention of the Federal Rules. Compton's testimony and report must be excluded for trial.

**III.**
**CONCLUSION**

For the reasons stated herein, Defendants pray that the Court strike Jeffery A. Compton as an expert witness in this case, and that Saybolt be prevented from calling Compton to testify at the trial of this matter.

Respectfully submitted,


/s/ *David L. Barron*

By:  David L. Barron
      Texas Bar No. 00798051
      Southern District of Texas Bar No. 21117
      dbarron@cozen.com
      Jennifer T. Williams
      Florida Bar No. 0174203
      jtwilliams@cozen.com
      COZEN O'CONNOR, P.C.
      1221 McKinney, Suite 2900
      Houston, Texas  77010
      Telephone:  (713) 750-3132
      Facsimile:  (832) 214-3905

      **COUNSEL FOR DEFENDANT**
      **AMSPEC, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via ECF on this 30th day of April 2018 to all counsel of record as follows:

Steven J. Mitby
AZA
Ahmad Zavitsanos Anaipakos Alavi Mensing
1221 McKinney, Suite 2500
Houston, TX 77010
smitby@azalaw.com

Matt Jackson
Adams and Reese LLP
11 North Water Street, Suite 23200
Mobile, AL 36602
matt.jackson@arlaw.com

**COUNSEL FOR PLAINTIFFS,
COUNTER-DEFENDANTS, AND
THIRD-PARTY DEFENDANT**

Ginger M. Busby
Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
gbusby@burr.com

Kathryn M. Willis
Burr & Forman LLP
11 North Water Street, Suite 22200
Mobile, AL 36602
kwillis@burr.com

**COUNSEL FOR DEFENDANTS STAIR,
FREEMAN, AND DAVENPORT**

*/s/ David L. Barron*
David L. Barron

35577564\4

19