# EXHIBIT 3

JEFFREY A. COMPTON - July 20, 2017

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF ALABAMA
 2                       SOUTHERN DIVISION

 3   CORE LABORATORIES, LP f/k/a)
     CORE LABORATORIES, INC.;   )
 4   AND SAYBOLT, LP            )
                                )
 5   VS.                        ) CIVIL ACTION NO.
                                )      1:16-CV-00526-CG-N
 6   AMSPEC, LLC; BOBBY         )
     DAVENPORT, HUGH FREEMAN;   )
 7   AND TRAVIS STAIR           )

 8

 9

10

11

12            ORAL AND VIDEOTAPED DEPOSITION OF

13                    JEFFREY A. COMPTON

14                       JULY 20, 2017

15                       VOLUME 1 OF 1

16

17

18

19

20   ORAL DEPOSITION OF JEFFREY A. COMPTON, produced as a
     witness, duly sworn by me at the instance of the
21   Defendants, taken in the above-styled and numbered cause
     on July 20, 2017, from 9:13 a.m. to 4:48 p.m., before
22   Cynthia C. Miller, Certified Shorthand Reporter No.
     8065, in and for the State of Texas, via machine
23   shorthand, at Ahmad, Zavitsanos, Anaipakos, Alavi &
     Mensing, 1221 McKinney, Suite 2500, Houston, Texas
24   77010, pursuant to the Federal Rules of Civil Procedure
     and any provisions stated on the record.
25
```

JEFFREY A. COMPTON - July 20, 2017

Page 42

1  Q. What was that firm?
2  A. It was called Burton, Cloud & Pittman.
3  Q. Before that it says you worked for Coastal.
4  A. Yes. As you're probably a little too young to
5  remember, Coastal split into Valero. That's how I came
6  to work for Valero.
7  Q. Have you ever been terminated from a job?
8  A. No.
9  Q. Have you ever filed for bankruptcy?
10 A. No.
11 Q. Have you ever been excluded by the court as a
12 witness, as an expert witness?
13 A. Partially, at times, yes.
14 Q. How many times?
15 A. Several.
16 Q. Do you recall the most recent?
17 A. I think in the New Resources case, which is on
18 Page 16, the work I was asked to do did not result in a
19 damages opinion. And so my testimony as to damages,
20 because I had none, was excluded.
21 Q. Okay. Any other cases that you can recall?
22 A. Let me just go down the list. In the Zhejiang
23 Medical, on Page 13, the magistrate excluded all of my
24 client's expert testimony. The appellant court reversed
25 and remanded the case back to the trial court.

Page 43

1  Q. Do you know whether it was reversed on that
2  issue, or a different issue?
3  A. You can, I think, read the opinion from the
4  federal circuit. It was reversed on the issue of one
5  expert and remanded as to all the experts.
6     And that's all out of these cases that I
7  recall any exclusion. Oh, sorry, W&T Offshore, I had
8  three opinions as to damages. They were under different
9  assumptions, and the court said that the contract only
10 allowed one of those assumptions.
11 Q. Are you answering that question as to what
12 cases you've been excluded only based on the list of the
13 cases that's in your report, or are you telling me all
14 that you can recall generally?
15 A. I'm telling you certainly what's in the last
16 four years. All my testimony in the last four years is
17 listed. If there was something prior to that, I'd have
18 to go back and look for it.
19 Q. Well, I'm asking you: Do you recall ever
20 being excluded from a case that's not listed in your
21 resume?
22 A. No. But again, I haven't studied that
23 recently.
24 Q. Do you recall being excluded in the Burrett
25 versus Aspect Energy case?

Page 44

1  A. I was not fully excluded. Yes, I think it was
2  a partial exclusion of my testimony in that case also as
3  to one of the damage models.
4  Q. I thought a minute ago you didn't remember,
5  now all of a sudden you remember being --
6  A. No, that's not --
7     MR. MITBY: Objection.
8  A. That's very unfair and mischaracterizes my
9  testimony. I told you that these are the cases I've
10 testified in the last four years. I didn't remember
11 anything prior to the four years, but I hadn't looked.
12 I indicated there could be others.
13 Q. (By Mr. Barron) And I'm asking you: Do you
14 recall other cases?
15 A. No, but apparently you've researched them.
16 And if you'll ask me about them, I will truthfully
17 answer as whether I was or wasn't excluded. I was
18 partially excluded in the Burrett case as to one of the
19 damages model.
20 Q. Sir, I'm asking you.
21 A. I'm telling you --
22    MR. MITBY: Object.
23 Q. (By Mr. Barron) Which ones do you recall?
24    MR. MITBY: Objection. You're arguing
25 with the witness, David. This is a continuation of the

Page 45

1  unprofessional conduct that happened yesterday, which
2  necessitated us trying to bring a videographer here. I
3  would ask you to please stop and to treat the way you
4  would want to be treated.
5     MR. BARRON: Mr. Mitby, I disagree with
6  your characterization. I do not believe this witness is
7  answering my question. And I think that was a
8  long-speaking objection.
9  Q. (By Mr. Barron) Sir, I'm just asking you,
10 which cases, older than four years, do you recall being
11 excluded?
12    MR. MITBY: And I'll object. The
13 question is asked and answered. This is about the third
14 time you've asked that question.
15 Q. (By Mr. Barron) Is it your testimony that you
16 don't recall any cases that are older than four years
17 where you've been excluded?
18 A. That's correct. And if you have others, I'm
19 glad to, again, answer truthfully as to what the
20 exclusion was. I told you my testimony had been
21 partially excluded in several cases. We've been over
22 three or four cases now.
23 Q. Do you recall being excluded in the Bradmark
24 Technologies versus Sanchez case?
25 A. I resigned from the case. I did not give an

JEFFREY A. COMPTON - July 20, 2017

### Page 62

1 that there is more than one competitor previously. More
2 than two competitors previously.
3  Q. It's not a zero sum game; correct? In other
4 words, the business that's lost by Saybolt doesn't all
5 necessarily go to AmSpec, it could go to other
6 competitors; correct?
7  A. That's possible. I don't know what business
8 went to AmSpec.
9  Q. Or SGS, or Intertech, or Inspectorate for that
10 matter; right?
11  A. Right.
12   MR. MITBY: Again, David, I'll renew my
13 request that you produce the invoices and the documents
14 that show how much money your clients --
15   MR. BARRON: Mr. Mitby, I will renew my
16 objection to you raising issues in this deposition that
17 are not related to the deposition.
18   MR. MITBY: It's highly --
19   MR. BARRON: I consider that to be
20 interrupting and harassing and it's wasting time. We're
21 here to take a deposition. If you'd like to discuss
22 other matters, there are other forums available for
23 that.
24   MR. MITBY: Okay.
25  Q. (By Mr. Barron) All right, Mr. Compton, you

### Page 63

1 said that Mr. Cowan talked to you about the potential to
2 close the Saraland office?
3  A. Right.
4  Q. What did he tell you about that?
5  A. He said that that was potentially something
6 that could happen if they were not able to mitigate
7 their losses.
8  Q. Did he share with you that there were plans to
9 close that office before these employees departed for
10 AmSpec?
11  A. No.
12  Q. Did you ask?
13  A. No.
14  Q. Did he share with you any history about the
15 profitability of the Mobile office?
16  A. Yes. I have the financial statements for the
17 Mobile office.
18  Q. All right. And I've seen those, but did he
19 share with you specifically when you talked with him any
20 details about the profitability of that office?
21  A. No.
22  Q. Did he say, for example, it was a very
23 profitable office, or not a profitable office?
24   MR. MITBY: Objection; vague. I'm not
25 sure what you're asking.

### Page 64

1  A. I think I said we didn't discuss
2 profitability. I had the financial statements for the
3 office.
4  Q. (By Mr. Barron) You said that he talked to
5 you about closing the office, though; correct?
6  A. Yes.
7  Q. Well, did he tell you why they were thinking
8 about closing the office?
9  A. Because they didn't know if they would be able
10 to gain sufficient employees and sufficient clients
11 after the loss of Chevron to make the office
12 economically viable.
13  Q. Have you had any follow-up discussions about
14 the possibility of closing that office with Mr. Cowan?
15  A. No.
16  Q. All right. You said you talked to -- well, to
17 close this out. Is there anything else you discussed
18 with Mr. Cowan that we haven't talked about?
19  A. I don't think so.
20  Q. You said you talked to Roberto Ramirez on
21 May 18th?
22  A. Yes.
23  Q. That was also on the telephone?
24  A. Yes.
25  Q. Who is Mr. Ramirez?

### Page 65

1  A. He's the manager at the Saraland location.
2  Q. Do you know when he was hired?
3  A. Sometime after the prior manager left, but no,
4 not the exact date.
5  Q. Do you know where he came from?
6  A. I thought he came from a different Saybolt
7 location.
8  Q. Who told you that?
9  A. It's my recollection from talking with him.
10 But I don't have that in my notes.
11  Q. Would it change your opinion at all if he was
12 hired and came from SGS, or some other competitor?
13   MR. MITBY: Objection. And that assumes
14 facts that are not in evidence.
15  A. I don't think so.
16  Q. (By Mr. Barron) Well, why wouldn't it? For
17 example, if -- if Saybolt went out and hired a bunch of
18 employees from a competitor after AmSpec hired some of
19 their employees away, why isn't that Saybolt doing the
20 exact same thing?
21   MR. MITBY: Objection; argumentative,
22 illogical.
23  A. I understand the issue in this case is not
24 about hiring employees but about the agreements the
25 employees had not to go to work for competitors for a

JEFFREY A. COMPTON - July 20, 2017

### Page 90

1  your report, please?
2  A. Okay.
3  Q. If you look on Page 2.
4  A. All right.
5  Q. There is a table with a year and a revenue
6  number.
7  A. Right.
8  Q. Do you see that?
9  A. Yes.
10 Q. And for 2012 through 2015, that would be the
11 full year's revenue?
12 A. Yes.
13 Q. And then there's a -- what I believe is year
14 to date through August 2016 for -- in the last line;
15 correct?
16 A. Right.
17 Q. Where did you get those numbers from?
18 A. It's in Tab C, particularly Tab C-1. They are
19 from financial statements for the Saraland location.
20 Q. Right. Those are the financial statements for
21 the Saraland or Mobile office; correct?
22 A. That's right.
23 Q. And this is the totals of all of the revenue
24 for that office; correct?
25 A. Yes.

### Page 91

1  Q. Now, if you look on the next page, there
2  are -- there's a table.
3  A. Right.
4  Q. And for roughly the same period; correct?
5  A. That's right.
6  Q. 2012 through September 2016.
7  A. Right.
8  Q. And under sales, you have a line for Chevron
9  and non-Chevron.
10 A. Right.
11 Q. And then a total line.
12 A. Right.
13 Q. All right. Would you agree that the Chevron
14 and non-Chevron sales should be all of the sales?
15 A. I think if you're referring to Footnote 11,
16 I've explained that there are differences. The way I
17 got the data for the Chevron, the non-Chevron sales was
18 in a different format.
19      And as I said in Footnote 11, the totals
20 are different. And as I said in Paragraph 6, I am
21 studying the connection between the work. And as I said
22 in Footnote 11, I'm continuing to analyze what the
23 differences are.
24 Q. Okay. Well, sitting -- you drafted this
25 report in, what, May?

### Page 92

1  A. That's right.
2  Q. And you've been continuing to analyze this
3  discrepancy since May?
4  A. No, I haven't.
5  Q. Well, when do you intend to analyze the
6  discrepancy and come up with a resolution of it?
7  A. If I need to supplement my report, based on
8  further discovery in this case, I'll do so. Again,
9  there hasn't been much discovery in the case.
10     So if I'm going to finish up my report,
11 I'd like to have the benefit of further discovery in the
12 case.
13 Q. Just to be clear, though, the discrepancy
14 isn't in Saybolt's records, not anything you'd need from
15 my client, for example, in discovery; right?
16     MR. MITBY: Objection; vague,
17 mischaracterizes testimony. Assumes facts.
18 Q. (By Mr. Barron) You can answer.
19 A. The discrepancy is between two different
20 reports produced by Saybolt. The discrepancy will be
21 addressed whenever I have the information I need to
22 supplement my report.
23     I'm not going to supplement it until I
24 have the benefit of further discovery in the case.
25 Q. Well, have you asked Saybolt for help in

### Page 93

1  figuring out why their numbers don't match up?
2  A. Yes. And I have not followed up on it since I
3  did my report because I was waiting to get additional
4  discovery and see if there were any other changes I
5  needed to make in my report.
6  Q. But you agree that whatever information you
7  need to reconcile the difference in the Saybolt numbers
8  would necessarily have to come from Saybolt; right?
9  A. Yes.
10 Q. And just to be clear, the difference is, if
11 you look at the totals, for example, for sales in 2012
12 on Page 1, it's 1.8 million -- I'm sorry, on Page 2,
13 it's 1.8 million. And on Page 3, it's a little over two
14 million; correct?
15 A. That's right.
16 Q. And the same is true for all the other years;
17 right?
18 A. There are differences between those years,
19 yes.
20 Q. Yes.
21 A. Usually about $200,000 a year.
22 Q. And sitting here today, you don't -- you don't
23 know why that is?
24 A. No, I haven't reconciled it. I will do so
25 when I'm given the opportunity to have sufficient

JEFFREY A. COMPTON - July 20, 2017

### Page 94

1 information to supplement my report. I don't think it's
2 making a material difference in my report.
3    Q. Where -- where did you get the numbers that
4 are on Page 3 of your report, the ones that are
5 different than the ones on Page 2 of the report which I
6 understand came from the financial statements?
7    A. They're also in Tab C. And instead of being
8 in Tab 1 of Tab C, they are in Tab 3. And again, they
9 are just broken down by customer.
10    Q. So if we look at Tab C, where would we find
11 the Chevron sales number for 2012?
12    A. Well, in Tab C-3, and you would have to add up
13 all of the Chevron entities, which are on the first
14 page.
15    Q. So this is a different report from the
16 financial statements of Saybolt; correct?
17    A. Right. It's a report just of sales by
18 customers. And it's coming off of Excel spreadsheets,
19 as we can see at the top of the report.
20       So it's not the financial statements.
21 There's a difference between this analysis, which was
22 done on a spreadsheet, and the financial statements.
23    Q. But you would agree the numbers -- that the
24 differences between the numbers are significant?
25    A. I just said I don't believe they're material

### Page 95

1 to my calculations.
2    Q. 200,000?
3    A. That's 200,000 of revenue.
4    Q. Right.
5    A. Yeah.
6    Q. But that's about a 10 percent difference. You
7 don't think that's significant as to revenue? For
8 example, for 2012, it's about 10 percent.
9    A. Yeah. And I guess if you studied my exhibits,
10 you know I'm using the lower revenue numbers in my
11 exhibits. So the potential is that, you know, the lost
12 profits could go higher if these revenues off of the per
13 customer analysis should, in fact, be used.
14       I think it's reasonable to use the
15 financial statements. I'm simply using the Chevron and
16 non-Chevron figures to show the relative amount of
17 business that Chevron's using.
18       As I say one more time, the financial
19 statement numbers, which are in Paragraph 4, are the
20 ones I'm using for the lost profits. They are lower
21 than the Paragraph 5 figures.
22    Q. So your testimony is, as I understand it, is
23 that you looked at these other numbers to be able to
24 break down the percentage of Chevron work versus
25 non-Chevron work; right?

### Page 96

1    A. That's right.
2    Q. And that was really the purpose of it?
3    A. That's all it is.
4    Q. Okay. And you did that through September of
5 2016; correct?
6    A. Yes.
7    Q. Have you looked at the breakdown between
8 Chevron and non-Chevron work after September 2016?
9    A. No.
10    Q. Why not?
11    A. Again, when I supplement my report with
12 sufficient information, I will do that. But I have not
13 done that to date.
14    Q. Do you think that's important?
15    A. I think it would be important ultimately to do
16 that, and I will do that when I have the benefit of the
17 discovery in this case.
18    Q. But again, that's information that you would
19 necessarily get from Saybolt; correct?
20       MR. MITBY: Object.
21    A. No. That's not true. That is information
22 that I can also get and verify with the AmSpec
23 information as to what business they're getting from
24 Chevron.
25    Q. (By Mr. Barron) Excuse me, sir. That's a

### Page 97

1 different issue.
2    A. I don't think so.
3    Q. The breakdown -- I mean, you did a breakdown
4 from 2012 all the way through September 2016 using
5 Saybolt's own documents; correct?
6    A. I did.
7    Q. You could have continued that same analysis
8 and breakdown after September 2016; correct?
9    A. I could have done that, but I want to have the
10 AmSpec information when I do it so that I can make a
11 complete analysis of where the work went, not just the
12 fact that it was reduced. I know it was reduced.
13    Q. So you made a strategic decision to not do
14 that analysis until you see certain other data; correct?
15       MR. MITBY: Objection; argumentative,
16 mischaracterizes facts. Is that a statement or a
17 question?
18       MR. BARRON: It is a question.
19    A. I've made a decision to wait until the
20 discovery in the case, and particularly the testimony of
21 the witnesses, has been more complete before I
22 supplement my report.
23    Q. (By Mr. Barron) So you're saying at some
24 point you intend to do an analysis of the breakdown as
25 between Chevron and non-Chevron work after September

JEFFREY A. COMPTON - July 20, 2017

Page 98

1 2016?
2 MR. MITBY: Objection; asked and
3 answered.
4 A. I'm saying when I have complete data about
5 what business AmSpec got from Chevron, and I have more
6 testimony -- and I have virtually none, I had none at
7 this point -- then I will supplement my report as
8 appropriate.
9 MR. MITBY: Is there a question pending?
10 MR. BARRON: Mr. Mitby, please, please
11 don't interrupt my deposition again.
12 Q. (By Mr. Barron) I want to turn your attention
13 to Paragraph 13.
14 A. Okay.
15 Q. You say that, "I understand for the purpose of
16 my work, this provision," talking about the provision in
17 the employment agreements, "means the employees were not
18 allowed to lawfully interfere with Saybolt's
19 relationship with Chevron, as they did, moving as a
20 group from Saybolt to AmSpec." What do you mean by
21 "moving as a group"?
22 A. I was referring to an e-mail from Sam Smedley
23 to Christian Cooper which referenced hiring Saybolt
24 employees in order to take Chevron work away. The
25 reference is hiring Saybolt's inspectors and lab techs

Page 99

1 approved in Chevron.
2 Q. Are -- you're not a lawyer; right?
3 A. That's right.
4 Q. Okay. So you don't know, for example, whether
5 there's any law that would prohibit one company from
6 hiring employees of another; right?
7 A. I think we've established it's not just hiring
8 the employees. It's the restrictions on the employees
9 that form the basis of my background understanding of
10 why there is liability.
11 I'm not determining the liability. I
12 just have to have a basic understanding of it for my
13 professional guidance.
14 Q. But just so I'm clear, you seem to be making
15 some assumption that there was something wrong or
16 unlawful about moving as a group from Saybolt to AmSpec.
17 Are you making that assumption?
18 A. No. I'm not making an assumption about it. I
19 have an understanding of what the problem legally is,
20 which is based upon talking with counsel and reading the
21 pleadings.
22 And as far as deliberately seeking to
23 take the Chevron work, and I think the e-mail goes on to
24 say the intent is to shut Chevron down, or the effect is
25 to shut Chevron down -- shut Saybolt down at Chevron,

Page 100

1 that that's what the problem is.
2 I even say in the paragraph I'm not
3 offering a legal opinion, and the court will determine,
4 or the jury will determine at the court's direction,
5 whether it was wrong for the employees to move from
6 Saybolt to AmSpec as they did.
7 Q. Just to be clear, the e-mail that you're
8 referring to was not sent by Mr. Freeman, Mr. Stair, or
9 Mr. Davenport; correct?
10 A. That's true.
11 Q. If you look at Paragraph 14, you say, "the
12 revenue of Saybolt's Saraland location decreased
13 significantly following the departure of the departed
14 employees as show on the graph below;" right?
15 A. Right.
16 Q. Do you see that?
17 A. Yeah.
18 Q. There's lots of reasons why revenue might go
19 down when employees leave; right? For example, the mere
20 fact that they left.
21 A. Well, no, not the mere fact that they left.
22 There would have to be some connection to the loss of
23 customer business. I mean, just leaving in and of
24 itself, it may or may not make a difference.
25 Q. Well, let me just give you a hypothetical.

Page 101

1 You're an expert. I've got ten employees. All ten
2 decide that, "I don't like working here," and they all
3 leave. Won't that have an impact on that business?
4 A. How many employees do you have?
5 Q. Ten. All ten leave.
6 A. Okay. So everyone leaves your office?
7 Q. Yeah.
8 A. All your employees leave?
9 Q. Every single one.
10 A. Yeah, that should have an effect on your
11 revenue.
12 Q. Okay. What if seven out of ten leave?
13 A. It may or may not have an effect on your
14 revenue, depending on whether you can replace them.
15 Q. Right. And that scenario that I just gave to
16 you, right, doesn't implicate anything unlawful;
17 correct?
18 A. Well, I wouldn't be able to give you an
19 opinion about whether it was unlawful or not. If those
20 employees who left had an agreement with you not to go
21 to a competitor and interfere with your business, then
22 sure, it might be a claim legally against those
23 employees for doing so.
24 Q. Right. So the question of whether there's an
25 agreement that restricts their ability to leave has a

JEFFREY A. COMPTON - July 20, 2017

**154**

1  see what I did consider for proximate cause. And I'm
2  not aware of any factors outside of the solicitation of
3  the employees that would cause any change in
4  profitability.
5      I know the revenue went down. How much
6  it went down as a result of the employees leaving may be
7  developed as the evidence is sought in this case. As
8  far as the expenses, I don't think it's necessary to do
9  a line item analysis of the expenses when they are, in
10 fact, lower.
11     I would expect them to be somewhat lower,
12 but I wouldn't expect them to be any lower than they
13 are. I don't think I have to go back and do a line item
14 analysis of expenses to establish the reason for the
15 decline in profitability.
16     If Saybolt had not reduced its expenses
17 at all, that may well have been their business judgment.
18 It's their business judgment apparently not to reduce
19 their expenses any further because they're trying to
20 regain business.
21     Q. Did you consider any outside causes of the
22 decline in the Saraland facility's profitability between
23 September 2016 and September 2018 besides the
24 defendants' actions?
25     A. Yes, I looked for any other causes. I asked

**155**

1  if there was a cause -- if there was a change in the
2  prices that they were being required to charge, and the
3  answer was no. Market conditions were not any
4  different, according to Mr. Cowan and Mr. Ramirez.
5      Q. What do you mean by market conditions? I want
6  to make sure --
7      A. They did not have to reduce their prices to
8  customers, and the market had not shrunk.
9      Q. Okay. Anything else that you considered that
10 might have been a cause besides the defendants' actions?
11     A. No, if there is something that the defendants
12 want to bring forward as a cause, I would be glad to
13 consider it, but I do not see it in the evidence to
14 date.
15     Q. Did you consider the individuals that were
16 hired to replace the departing employees?
17     A. In what way?
18     Q. The qualifications and reputation of those
19 individuals.
20     A. No. Other than I presume they did not have
21 the same relationship with Chevron that the departing
22 employees had. That was pretty clear in the e-mails we
23 talked about earlier, that the departing employees had
24 important relationships with Chevron.
25     Q. But you don't know if the new employees had

**156**

1  important relationships with Chevron, do you?
2      A. I've seen no evidence that they did or did
3  not.
4      Q. You haven't asked that question?
5      A. No. And as the evidence develops in the case,
6  I will learn the answer to that question. Again, I had
7  very little evidence in this case to work with relative
8  to the discovery.
9      Q. Do you agree that's an important question to
10 ask?
11     A. What the qualifications of the replacing
12 employees are?
13     Q. Yes.
14     A. No, I don't think it's an important question
15 for me to ask, to do my work. If the evidence turns out
16 that those employees had a great relationship with
17 Chevron, that would be somewhat surprising since I
18 understand there's been a significant decline in Chevron
19 business. But we'll wait to see what the evidence is
20 about the relationship of those employees with Chevron.
21     Q. Just so I'm clear, for purposes of your lost
22 profits analysis, if the Saraland facility was hit by a
23 bus, or got burned down in a fire -- strike that.
24     If the Saraland facility had a fire and
25 was down for a month, would you have considered that as

**157**

1  a possible explanation for a dip in profits?
2      A. Yes.
3      Q. Okay. So you -- you're conceding that there
4  could be some theoretical causes for the decline in
5  profits of the Saraland facility other than actions of
6  the defendants; correct?
7      A. It's possible. I haven't seen that.
8      Q. All right. And your testimony is here today
9  that you have thoroughly analyzed this situation to see
10 if there are any causes like, for example, a fire, that
11 might possibly explain the loss of profits, other than
12 the actions of the defendants?
13     A. It's my testimony that to the extent there's
14 been discovery in this case, I've reviewed it. It's
15 also my testimony that I expect there will be more
16 discovery, and I will continue to review it. If I need
17 to change something about my lost profits calculation, I
18 will certainly do so.
19     Q. I want to go back to the G&A allocation --
20     A. Okay.
21     Q. -- that you mentioned earlier, all right?
22     A. Yeah.
23     Q. You would agree that typically G&A includes
24 things like IT, for example; correct?
25     A. Depends on what G&A we're talking about. I

JEFFREY A. COMPTON - July 20, 2017

### Page 166

1  Q. Well, there's A through G.
2  A. Well, okay. But if you're going to quote from
3  my report, let's do it correctly. "I considered
4  proximate cause for the purpose of my opinions and
5  determined," colon.
6  Q. You're right, there's a colon there. I'm
7  sorry.
8  A. Okay. I mean, if you're going to say I said
9  something --
10  MR. MITBY: Object to sidebar.
11  A. -- let's make it what I said.
12  Q. (By Mr. Barron) Well, we can read it all into
13  the record. I'm just trying to point your attention to
14  the part of the report --
15  A. Go ahead. Go ahead.
16  Q. -- I was going to ask you about. We start off
17  in Part A with, AmSpec was not in this market so it did
18  not have loyal customer relationships except through the
19  employees subject to agreements with Saybolt. Do you
20  see that?
21  A. The way you said it, to my ear, was "loyal."
22  I think the word I wrote was "local."
23  Q. I'm sorry. Local. You're correct. Where did
24  you get that information from?
25  A. AmSpec's press announcement where they said

### Page 167

1  that they were commencing inspection and testing
2  services in Mobile and expanding their domestic service
3  network.
4  Q. And how did you -- how did you get from that
5  press release to the assumption that AmSpec didn't have
6  any local customer relationships, except as employees?
7  A. Well, they weren't -- they weren't in the
8  market. They didn't have local customer relationships.
9  They weren't in the market, so they couldn't have local
10  customer relationships.
11  Q. Do you know, for example, whether AmSpec
12  marketing people had regularly visited Pascagoula
13  facility in the past?
14  A. I have no doubt they could have visited
15  Chevron at Pascagoula. They did not have a local
16  customer relationship in terms of doing business.
17  That's why they needed the Saybolt employees, according
18  to their e-mails.
19  Q. But there's a difference between not having an
20  office locally and not having a relationship --
21  A. Okay.
22  Q. -- with the people that are in Pascagoula;
23  correct?
24  A. Yeah. You're arguing with me about proximate
25  cause. I'm not here, we established earlier, to tell

### Page 168

1  the jury that Saybolt or AmSpec caused the loss. I'm
2  telling you these are my considerations for proximate
3  cause.
4  I understand you dispute them. I don't
5  have to prove them to the jury. I don't plan to prove
6  them to the jury.
7  Q. I'm just asking you what you said in your
8  report.
9  A. And I've told you what I said and why I said
10  it. And now you're arguing with me about whether that's
11  really the ultimate fact or not.
12  Q. No. I'm just trying to find out if what you
13  said is accurate.
14  A. Well, you can -- you've established why I said
15  it. I've told you what I said it from. And I
16  understand you disagree with it, and you seek to
17  challenge it, but I have no more to tell you as support
18  for that statement beyond the fact that AmSpec announced
19  that they were commencing inspection and testing
20  services.
21  And that is the basis for me saying they
22  did not have a local customer relationship because they
23  had not commenced inspection -- inspection and testing
24  services.
25  Q. So in your -- in your -- for purposes of your

### Page 169

1  report, you don't see any reason to change it, for
2  example, if AmSpec employees were best buddies with
3  everybody at the Chevron Pascagoula facility before
4  September 2016, that wouldn't matter to you?
5  MR. MITBY: Objection; argumentative,
6  assumes facts.
7  A. If that's what the evidence comes out to show,
8  I'll certainly consider that. But right now, as I
9  understand it, that's entirely speculative.
10  Q. (By Mr. Barron) On Part B, you say, "With the
11  assistance from Bobby Davenport, AmSpec obtained the
12  Saybolt employees as a group needed to perform the
13  Chevron work." What are you basing that on?
14  A. What's in Tab E-2.
15  Q. Is there something in specific in Tab E-2?
16  A. It's really both of the e-mails that are in
17  there. We can read them. I think we read some of them
18  earlier today.
19  Q. Which e-mails specifically are you referring
20  to?
21  A. Okay. I said it's both of the e-mails. It's
22  all the e-mails that are in the tab. I guess I just
23  need to go through it.
24  So there's an e-mail from Malcolm Valla
25  on March 14th of 2016 to Matt Core, he says, "Thanks.

### 178

1  MR. MITBY: Assumes facts. Speculation.
2  Q. (By Mr. Barron) Well, you understand that
3  AmSpec is doing business with Chevron; correct?
4  A. That's what I've been understanding, yes.
5  Q. Right. I mean, you knew that when you drafted
6  your report; correct?
7  A. Yes. But I don't know the extent of it.
8  Q. Well, does it matter?
9  A. Yes.
10 Q. So if Saybolt lost $10 and -- from Chevron,
11 and AmSpec only got one, what is the proper measure of
12 damages there? Is it the one that AmSpec got, or is it
13 the ten that Saybolt lost?
14 A. It could be either.
15 Q. Is it just which ever one is higher?
16 A. No, it can be either.
17 Q. Which one should it be?
18 A. I don't think there's a choice to be made
19 based on the hypothetical that you've given me. I could
20 present them both, or I could present one or the other.
21 But I don't have the information to do either.
22 Q. Well, you have Saybolt's numbers, you do have
23 the information from Saybolt?
24 A. And I presented --
25 MR. MITBY: Objection; argumentative.

### 179

1  A. Yeah, it will be clear. I did present the
2  Saybolt numbers.
3  Q. (By Mr. Barron) Well, do you intend to change
4  your mind and then rely on AmSpec's numbers at some
5  point?
6  A. I don't intend to do anything because I
7  haven't seen your client's data.
8  MR. MITBY: And to be clear, David, your
9  client has refused to produce this data. We've been
10 asking for invoices for months.
11 MR. BARRON: That's not true.
12 MR. MITBY: We've been asking for your
13 financials for months. We've asked to see the data that
14 shows your level of business with Chevron.
15 You've covered it up. You've refused to
16 produce it. And now you're trying to fault Mr. Compton
17 because he hasn't considered data that you -- that you
18 have not produced despite legitimate discovery requests.
19 MR. BARRON: I disagree with your
20 characterization of everything. And again, this is --
21 we're not going to talk discovery in this deposition.
22 MR. MITBY: Well, will you produce
23 discovery --
24 MR. BARRON: Mr. Mitby, I'm not going to
25 talk discovery in this deposition. I'm going to try to

### 180

1  ask your witness questions.
2  MR. MITBY: Well, I'm not going to allow
3  you to ask questions about documents you have not
4  produced.
5  MR. BARRON: Are you -- are you
6  instructing the witness not to answer questions?
7  MR. MITBY: I'm going to wait and see
8  what your question is, there is no question pending.
9  But I'm not going to let him answer questions about
10 documents you haven't produced. We're not going to play
11 that game.
12 If you have these documents, produce
13 them. It's your obligation. Otherwise, don't ask him
14 questions about them.
15 Q. (By Mr. Barron) Mr. Compton, you're the
16 expert in this case, and I'm asking you: What is the
17 appropriate measure of damages in this case, is it what
18 Saybolt has lost, or is it what AmSpec has gained?
19 MR. MITBY: Objection; asked and
20 answered. He's already told you this many times. And
21 you have not produced the documents --
22 MR. BARRON: Mr. Mitby, please --
23 MR. MITBY: -- to show what AmSpec has
24 taken. You have not done that. You have refused
25 steadfastly to produce those documents.

### 181

1  MR. BARRON: Please limit your objections
2  to the objections that are allowed under the Federal
3  Rules of Civil Procedure.
4  A. It can be either.
5  Q. (By Mr. Barron) It can be either. Okay.
6  Thank you. And when do you anticipate making the
7  determination what your opinion will be in this case,
8  which one you will choose?
9  MR. MITBY: Objection; assumes facts,
10 argumentative, mischaracterizes his report and prior
11 testimony.
12 A. I don't intend or have an expectation about
13 anything based on records I haven't seen.
14 Q. (By Mr. Barron) I understand that. I just
15 want to know whether I can rely on your testimony here
16 today or whether you intend to change it. That's why
17 I'm asking the question.
18 MR. MITBY: Objection; argumentative,
19 asked and answered. If you want to ask him about these
20 documents for the hundredth time, produce the documents.
21 They're discoverable. You're the one that has --
22 MR. BARRON: Mr. Mitby, please, please
23 stop interrupting this deposition.
24 A. You can certainly rely on my preliminary
25 report, but being a preliminary report, it anticipates

JEFFREY A. COMPTON - July 20, 2017

## Page 182

1 receiving additional information. When I receive the
2 additional information, I may, if appropriate, modify my
3 report.
4     Q. (By Mr. Barron) Okay. And under what
5 circumstances would you modify your report?
6         MR. MITBY: Objection; speculation.
7     A. You're asking me a question, yeah, based on
8 complete speculation. It depends on what gets produced
9 in this case.
10     Q. (By Mr. Barron) Well, you're an expert, you
11 can handle hypotheticals; correct?
12     A. No, no, that's not a hypothetical question.
13         MR. MITBY: Objection; speculation.
14     A. If you want to ask me, if I gave you X, what
15 would you do, I'm glad to ask a specific hypothetical
16 question.
17     Q. (By Mr. Barron) Okay. If I gave you
18 documents that showed that AmSpec only got half of what
19 you're claiming in losses, what would you do?
20         MR. MITBY: Objection. You're -- once
21 again you're questioning him about documents that you
22 haven't produced. Produce the documents for the last
23 time. Quit hiding them.
24         MR. BARRON: Mr. Mitby --
25         MR. MITBY: You can ask him about them.

## Page 183

1         MR. BARRON: -- you are interrupting this
2 deposition, and it's getting old.
3     A. If you gave me records, I would look at the
4 profitability of what AmSpec received out of entering
5 the Mobile market.
6         And I would consider that in relation to
7 what Saybolt lost after AmSpec entered the Mobile
8 market, but I cannot answer how I would select a
9 particular amount unless and until I have sufficient
10 relevant data to do so.
11         And your hypothetical will not be
12 supplying me with sufficient relevant data to say how I
13 would do a report.
14     Q. (By Mr. Barron) Would you also need to know
15 whether the work went to other inspection companies?
16     A. I would consider whether the work went to
17 other inspection companies as well.
18     Q. Wouldn't you agree that if, for example,
19 Saybolt lost $10 on Chevron and AmSpec only got five,
20 that somebody else got the other five?
21         MR. MITBY: David, I've given you a lot
22 of leeway on this.
23         MR. BARRON: Mr. Mitby, please stop.
24         MR. MITBY: You have not produced the
25 documents --

## Page 184

1         MR. BARRON: Please stop.
2         MR. MITBY: -- that we have asked for.
3 You are trying to question our expert about documents
4 that you've refused --
5         MR. BARRON: I'm asking him about --
6         MR. MITBY: I've given you many
7 opportunities to produce it.
8         MR. BARRON: Mr. Mitby.
9         MR. MITBY: He's not going to continue to
10 answer hypothetical questions --
11         MR. BARRON: Discovery disputes are not a
12 basis under the rules --
13         MR. MITBY: -- about you -- about what
14 would happen --
15         MR. BARRON: -- what an expert witness --
16         MR. MITBY: -- if you comply with your
17 obligations --
18         THE REPORTER: Gentlemen.
19         MR. MITBY: -- under the Federal Rules of
20 Civil Procedure. You have a duty to produce these
21 documents. Do it, and you can ask him questions.
22 You've got the documents in your possession, you can
23 produce them to us now.
24         MR. BARRON: Are you done?
25         MR. MITBY: I'm not going to let him

## Page 185

1 answer more questions about -- about documents that you
2 have not produced.
3         MR. BARRON: Well, then instruct him not
4 to answer. If you want to instruct him not to answer,
5 instruct him not to answer.
6         MR. MITBY: I don't think we have a
7 question pending right now.
8         MR. BARRON: Well, then limit your
9 interruptions to either an objection or instructing him
10 not to answer.
11     Q. (By Mr. Barron) Would you agree that it would
12 be inappropriate to opine that the defendants in this
13 case are responsible for lost revenues that didn't, in
14 fact, go to AmSpec? Would you agree with that general
15 proposition?
16     A. No. It depends on why they didn't go to
17 AmSpec. If there was some action by AmSpec in entering
18 the marketplace, and taking the employees, and
19 interfering with the relationships that caused the work
20 to go to another company, a third company, then I
21 understand it, there would be liability for AmSpec
22 because of their interference. Whether AmSpec got the
23 work or not.
24     Q. So in that scenario, then it wouldn't matter
25 what AmSpec got from Chevron or any other company;

JEFFREY A. COMPTON - July 20, 2017

**Page 186**

1 correct?
2    A. Yes, it would be, because that would be part
3 of your hypothetical.
4    Q. But you just said that if AmSpec entering the
5 marketplace and taking these employees away led to the
6 work going to, let's just say, Inspectorate, a third
7 party; right? Is it your testimony that AmSpec should
8 be liable for that?
9    A. If it's because of some prohibited conduct on
10 behalf of the employees and AmSpec, yes.
11    Q. And do you know if your damage model includes
12 such amounts?
13        MR. MITBY: Objection; vague. Assumes
14 facts.
15    A. My damage model includes the losses of
16 Saybolt. Saybolt's losses from my evaluation to date at
17 this early stage in discovery arise from the actions of
18 AmSpec.
19        If there is further discovery that
20 indicates the losses don't arise entirely from the
21 actions of AmSpec, I will certainly consider that and
22 appropriately adjust my calculation.
23    Q. (By Mr. Barron) On the financial statements
24 for the Saraland facility, there are legal costs and
25 consulting costs. Do you know what those are for?

**Page 187**

1    A. As I understand, the legal costs are for this
2 lawsuit. As to the consulting costs, I don't know what
3 those are for.
4    Q. How do you know -- how do you know that the
5 legal costs that are listed on the financial statements
6 are for this lawsuit?
7    A. I went over that with Mr. Cowan when we were
8 reviewing my report and exhibits.
9    Q. Are you familiar with the financial
10 performance of Core Laboratories as a whole?
11    A. I've read their 10K.
12    Q. What did you find in the 10K? What was
13 your --
14    A. I have no idea how to answer that question. A
15 10K is a long document.
16    Q. What did you find is important -- I'm sorry, I
17 didn't mean to interrupt you. Go ahead.
18    A. Thank you. I didn't specifically find
19 anything. They don't report Saybolt as a segment, so I
20 wasn't able to establish what Saybolt as a whole was
21 doing in terms of a segment of Core Labs.
22    Q. Do you know if the financial performance of
23 Core Labs over the last three years has been going up or
24 down?
25    A. I don't recall as I sit here. Since I wasn't

**Page 188**

1 able to identify Saybolt separately, I didn't further
2 rely on the 10K.
3    Q. Would that matter to you?
4    A. Saybolt overall's performance?
5    Q. Or Core Labs' performance.
6    A. Well, not if I can't tell what Saybolt is
7 within Core Labs. Core Labs has mostly a geologic
8 inspection business, not a petroleum inspection
9 business.
10    Q. Do you know if Saybolt has closed down offices
11 in the United States in the last six months?
12    A. I don't know.
13    Q. Do you know if Saybolt has a poor reputation
14 in the industry in the last, say, one to two years?
15    A. I don't know.
16    Q. Wouldn't that be important in your lost profit
17 analysis?
18    A. You know, again, I appreciate, you know, that
19 I'm the second guy up, and there have been no fact
20 witnesses. So a lot of the questions you ask me seem to
21 relate to things that may come up in this case.
22        I was required to do a report as of a
23 certain date. I didn't have the benefit of any
24 discovery. As people testify about reputation of Core
25 Labs, other factors for the loss of Chevron, I'll

**Page 189**

1 certainly incorporate those as appropriate, but I
2 haven't had the benefit of seeing any of that at this
3 point.
4    Q. Did you ask anybody at Saybolt about whether
5 the business levels at Chevron have been consistent
6 since September 2016?
7    A. I didn't -- wait a minute. Are you saying
8 after September of '16?
9    Q. Yes.
10    A. No. We've established I didn't analyze the
11 Chevron business after September of '16. I've looked at
12 the entire business of the Saraland location after
13 September of '16.
14    Q. Have you looked at whether there's any cycles
15 in the Saybolt's business with Chevron? For example, do
16 things go up or down certain times of the year?
17    A. As far as certain times of year, I have the
18 monthly sales data, but I have not specifically studied
19 whether there's a seasonal effect to it.
20    Q. So you don't know if the fourth quarter, or
21 the first quarter, or any quarter is slow, busy --
22    A. Well --
23    Q. -- for that branch?
24    A. Okay. We had eight months of data for 2016,
25 and it was proportionately higher than the 12 months of

JEFFREY A. COMPTON - July 20, 2017

**Page 210**

1  Q. Right. Right. Do you -- and I apologize, we
2  started so long ago, you may not remember this, but I
3  represent Mr. Freeman and Mr. Stair and Mr. Davenport.
4    A. Okay.
5  Q. And do you know, specifically -- I know you
6  testified earlier, you understood Mr. Davenport was
7  retired.
8    A. Yes, sir.
9  Q. Or had been retired. Do you know what
10 Mr. Freeman and Mr. Stair's job was while they were at
11 Saybolt?
12   A. Yes, I think I have that in my report. It's
13 in Paragraph 7.
14 Q. I'm sorry. I'm looking at Paragraph 7. My
15 question was: Do you know what their jobs were?
16   A. Right. Could you go maybe to the next page,
17 it's still going on over there.
18 Q. Oh, in your chart?
19   A. Yeah.
20 Q. I was looking for words. I apologize. Okay.
21 All right. So Travis Stair is the scheduler, according
22 to this chart; correct?
23   A. Yes, ma'am.
24 Q. Who provided this information to you?
25   A. I got that out of the original complaint,

**Page 211**

1  which was Document No. 1 on the docket, and it's on
2  Page 6.
3  Q. Okay. And you testified earlier that you
4  knew some about this type of business. Do you know
5  specifically what the scheduler does?
6    A. A scheduler makes sure that people or
7  equipment is in the right place at the right time.
8  Q. So the scheduler is not dedicated to any
9  particular client, would you agree?
10   A. I'm not sure about that in this case. And
11 usually, like when I was at Valero, the schedulers would
12 have relationships with schedulers at other companies,
13 where, you know, they would tend to work together.
14     Like one guy might work with the Conoco
15 guy, and another lady might work with, you know, pick a
16 name, Chevron person.
17     So I think, you know, there tend to be,
18 like in any business, you know, tend to be relationships
19 that develop and people tend to work more with others,
20 with specific people as opposed to others.
21 Q. I hear what you're saying, but basically, I
22 think what you're telling me is that you don't know as
23 it relates to these particular individuals.
24   A. Well, I think the e-mails we talked about,
25 like in Tab E, indicate that these are -- these people

**Page 212**

1  who left are important to the Chevron relationship as a
2  whole.
3  Q. Do you -- did the Saybolt-Saraland location
4  have more than one scheduler?
5    A. I don't know if it had another scheduler
6  beyond Travis. I just haven't looked.
7  Q. Okay. So if they only had one scheduler, you
8  understand that the scheduler is not dedicated to any
9  one client, they have to schedule jobs for all
10 particular clients?
11   A. If they only had one, I agree with you.
12 Q. Okay. And then you have these three gentlemen
13 who are listed as inspectors. Do you know whether or
14 not they did jobs other than Chevron jobs?
15   A. They may have done jobs other than Chevron. I
16 don't know.
17 Q. And the same question with the two gentlemen
18 listed as lab technicians: Do you know if they did lab
19 work for companies other than Chevron jobs?
20   A. They may have. I don't know.
21 Q. Okay. And then Mr. Freeman is the location
22 manager. Is that the same position that the gentleman,
23 Mr. Ramirez, is now in?
24   A. I don't know if I have Mr. Ramirez' exact
25 title, but yes, I understand that Mr. Freeman was over

**Page 213**

1  the office, and Mr. Ramirez replaced him. So as to
2  title, I'm not sure, but I understand as to function,
3  yes.
4  Q. Okay. And so when you spoke to Mr. Ramirez,
5  did he talk to you at all about the percentage of his
6  work that he does for one client versus another as an
7  example?
8    A. Not specific percentages, no.
9  Q. Okay. Did he talk about that at all?
10   A. Well, he said he was trying hard to get
11 Chevron work back. And I think Mr. Cowan said the same
12 thing.
13 Q. Okay. Do you know or do you have an opinion,
14 I guess, based on anybody that you've talked to, what
15 Chevron's interaction or opinion was of giving work to
16 Saybolt, let's say, in -- prior to these employees
17 leaving?
18   A. Well, I understand these employees had a good
19 relationship, an important relationship with Chevron.
20 That's, again, in the e-mails in Tab E.
21 Q. And you don't dispute that Chevron can give
22 work to whoever Chevron wants to give work to. Is that
23 fair?
24   A. Everything else being equal, yes.
25 Q. Okay. The -- do you -- did you talk to

JEFFREY A. COMPTON - July 20, 2017

### 218

1  Q. All right. So set that aside.
2  A. Okay.
3  Q. I'm not trying to argue that.
4  A. Thank you.
5  Q. That's for later people to talk about.
6  A. Or earlier today.
7  Q. Okay. You agree that if there is a location
8  where there's four competitors and now there's five,
9  then all things being equal, your percentage of sales is
10  going to go -- or revenue is going to go down?
11  A. If those are the only facts, that would be
12  reasonable.
13  Q. Okay. So if we assume that as true, that's a
14  generally accepted principle, that --
15  A. Yeah.
16  Q. -- the more competitors the, you know, less
17  revenue any one company is going to get, how would you
18  factor that in to reducing the lost profits number that
19  you've come up with?
20  A. Well, I think you have to look at why is the
21  fifth competitor getting business. And if the fifth
22  competitor is getting business for something that's not
23  improper, or bad act, or creates legal liability, then,
24  you know, it needs to obviously be adjusted from the
25  revenues.

### 219

1  Q. And then how would you do that? That's my
2  question.
3  A. Well, let's use the simple example, if there's
4  no restrictions, there's no bad act, if a fifth
5  competitor comes in, I mean, whatever revenue went away
6  from competitors one through four, there's nothing wrong
7  with that. I mean, there would be no lost profit.
8  Q. Right.
9  A. Yeah.
10  Q. And I guess that's one of the things that,
11  just looking at this document that your report cited to,
12  the calculating lost profits document, I tried to
13  analyze some of the things that it said. And based on
14  your testimony now, I think I understand.
15  You've not revised your number or
16  considered or factors that would have affected the
17  revenue yet, and the reason for doing it -- not doing it
18  is you're not saying you're not going to do it, you're
19  saying that you don't feel you have sufficient
20  information to this point to reduce those revenues with
21  other factors, if there are other factors to be
22  considered?
23  A. I mostly agree with you. I'll just say that I
24  haven't seen anything that indicates that there are
25  factors other than the hiring of these employees that

### 220

1  caused the Saybolt revenues to go down.
2  Q. Well, there's nothing wrong with hiring two,
3  three, five, ten, 17 employees of any company.
4  A. Right, right.
5  Q. You agree with that?
6  A. Yep.
7  Q. Okay. So that's why I said let's set this
8  aside for our discussion.
9  A. Uh-huh, yeah.
10  Q. I mean, I understand that you, in your report,
11  have set down bases of opinions of, you know, arguments
12  of the plaintiff that, you know, they think that, or
13  they have an opinion that there's been some wrongdoing.
14  A. Right.
15  Q. Or that a court will find wrongdoing.
16  A. Right.
17  Q. And then your numbers would be relevant. I'm
18  just trying to get to: What are the other factors that
19  should be looked at? Because I'm trying to avoid having
20  to do this again.
21  I mean, there's going to be discovery.
22  It sounds to me like if this is a preliminary report,
23  and you're going to have to look at other information
24  that comes out, that we really just going to adjourn
25  this deposition, or reconvene it.

### 221

1  So before we get to that point, that's
2  what I'm trying to ask you. I know you're saying at
3  this minute, you don't see or know anything, but what
4  are some of the factors that in the past or in your
5  experience you normally look at to adjust revenue?
6  A. Well, one that we talked about was like the
7  market decline or a pricing change, which I did look at,
8  I did ask about.
9  I asked about it, as a matter of fact,
10  today with Mr. Cowan before the deposition, say, you
11  know, "Look, I'm about to give a deposition, you know,
12  has something changed in the market, or are you having
13  to give up pricing, have you given up pricing?"
14  He said no, he's kept his contracts
15  renewed at the same price level. So that would be the
16  major factor.
17  And that's what I've experienced in other
18  cases is if I have a market that's declining, I need to
19  figure out how much of the decline is due to, you know,
20  bad acts versus just the market in general.
21  Q. Right. And speaking of that, did you -- when
22  you said Cowan, it reminded me of this. I now remember
23  why I kept thinking about his name.
24  He did -- this is my word, I suspect,
25  there's been produced some e-mails from Mr. Cowan. Have