**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CORE LABORATORIES LP f/k/a/** | ) |
| **Core Laboratories, Inc. et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) **CIVIL ACTION NO. 16-0526-CG-N** |
| | ) |
| **AMSPEC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of Defendant/Counter-Plaintiff, AmSpec, LLC ("AmSpec") for partial summary judgment on its Counterclaim against Core Laboratories and Saybolt LP (collectively "Saybolt"), and its third party claim against Christopher Bartlett (Docs. 200, 201), opposition thereto filed by Saybolt and Bartlett (Doc. 245), and AmSpec's reply (Doc. 270), as well as Saybolt and Bartlett's motion for summary judgment (Doc. 202), opposition thereto filed by AmSpec (Doc. 237), and Saybolt and Bartlett's reply (Doc. 268). AmSpec claims that Bartlett breached his employment contract by violating the non-solicitation and non-disparagement provisions. AmSpec further claims that Saybolt tortuously interfered with its employment contract with Bartlett by inducing Bartlett to violate that contract with full knowledge of the provisions at issue. For reasons which will be explained below, the Court finds there is are genuine issues of material fact as to AmSpec's claims against Saybolt and Bartlett and, therefore, that the mutual motions are due to be denied.

FACTS[1]

This action was filed by Plaintiffs, Core Laboratories and Saybolt, asserting claims of conspiracy, tortious interference with contracts, breach of contract, breach of fiduciary duty, and theft of trade secrets against AmSpec and three individual Defendants. (Doc. 1). Core Laboratories and Saybolt are both Delaware limited partnerships with their principal places of business in Houston Texas. (Doc. 1, ¶¶ 1, 2). Defendant Amspec is a New Jersey limited liability company with its principal place of business in New Jersey. (Doc. 56 ¶ 1). AmSpec asserts a counterclaim against the Saybolt entities for tortious interference with a contract and asserts a third-party claim against an individual, Christopher Bartlett, for breach of contract. (Doc. 56). Saybolt and Amspec are competitors; both provide inspection, monitoring, and testing services to the oil and gas industry. (Doc. 45, ¶¶ 12, 17). Saybolt has an office in Saraland, Alabama; Amspec decided to open an office in nearby Mobile, Alabama in 2016. (Doc. 56, ¶ 3; Doc. 203-10, p. 3).

In March 2016, Christopher Bartlett went to talk to AmSpec about a job at

---

[1] AmSpec objects to some of the exhibits submitted by Saybolt and Bartlett in support of their motion for summary judgments on the basis that they lack authentication. However, exhibits used at the summary judgment stage need not be authenticated or otherwise presented in admissible form; rather, they must be capable of being reduced to an admissible form at the time of trial. *Johnson v. Mobile Infirmary Med. Ctr.*, 2015 WL 1538774, at *1 (S.D. Ala. Apr. 7, 2015); *Abbott v. Elwood Staffing Services, Inc.*, 44 F.Supp.3d 1125, 1133–35 (N.D. Ala. 2014) (explaining that, under the 2010 amendments to Rule 56, "an objection cannot be based solely on evidence not being authenticated—the objection must be that evidence cannot be presented in admissible form, not that the evidence has not been presented in admissible form"). AmSpec has not argued that the exhibits could not be presented in admissible form. Accordingly, AmSpec's objection is overruled.

AmSpec's New Orleans office and he filled out an application. (Doc. 203-1, pp. 3-4). In March 2016, Bartlett also filled out an authorization for background check, a W-4 tax form, and signed a document titled: "New Employee Agreement Relating to AmSpec's Trade Secrets and Proprietary and Confidential Information." (Doc. 203-1, pp. 23, 52-54; Doc. 203-2, p. 18-25). AmSpec told Bartlett it was interested in setting up a position for him that would just deal with one product – fuel oil. (Doc. 203-1, p. 4). Bartlett told AmSpec he was interested and would "take it." (Doc. 203-1, p. 4). However, according to Bartlett, he was not offered a job in March 2016. (Doc. 203, p. 52, 202-1, p. 4). Bartlett was hired by AmSpec in June 2016 as "Fuel Oil Point of Contact" and started work June 1. (Doc. 203-1, pp. 4-5).

The employee agreement was signed on March 23, 2016, by Bartlett as Employee and by Elizabeth DeBaro for AmSpec and included the following two clauses:

> (c) Non-solicitation of Employees.
>
> I agree and covenant not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of AmSpec for the purpose of competing with AmSpec, during my employment with AmSpec and for the 12 month period following my termination of employment with AmSpec, for any reason or no reason and whether employment is terminated at the option of me or AmSpec. For purposes of this paragraph, "employee of AmSpec" means any employee who (i) is currently employed by AmSpec or was employed by AmSpec at any time within the 12 month period preceding the solicitation, hiring or recruitment, and (ii) reported to me directly or indirectly."
>
> . . . .
>
> **Non-disparagement.** I agree and covenant that I will not at any time after my employment with AmSpec terminate, make, publish or

communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning AmSpec or its businesses, products or services or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties.

(Doc. 203-2, pp. 21, 22). The employee agreement also includes a governing law clause that states that "it shall be construed in accordance with the laws of New Jersey." (Doc. 203-2, p. 23). AmSpec produced a copy of the signature page to a second employee agreement that was also signed by Bartlett on March 23, 2016,[2] but was not signed by anyone from AmSpec. (Doc. 204-7). This second agreement has at least one identical clause, but the second agreement is different from the other agreement and it cannot be determined from the signature page whether it contains the two clauses quoted above from the first agreement.[3]

On August 3, 2016, approximately two months after Bartlett began working at Amspec, Saybolt offered Bartlett a job at Saybolt's Louisiana office and Bartlett accepted. (Doc. 203-1, pp. 6-8). Bartlett turned in his resignation on August 9, 2016, and that was his last day to work for AmSpec. (Doc. 203-1, p. 8). When Saybolt hired Bartlett, Saybolt's Regional Manager, James Cowan, had heard rumors that

---

[2] Saybolt reported in their motion for summary judgment that the second agreement was dated June 2016 (when Bartlett began work at AmSpec), but the exhibit shows it was signed the same day as the other agreement.

[3] Both agreements contain a clause number 16 that requires Bartlett to provide a copy of the agreement to any subsequent employer. However, the second agreement ends after paragraph 16, whereas the first agreement continues with a paragraph 17 entitled "Consideration" that states that execution of the Agreement is a condition of Bartlett's employment and his employment "constitutes the consideration." (Doc. 203-2, p. 25; Doc. 204-7). The rest of the second agreement is not included with the exhibit. Mr. Bartlett was asked about an agreement he signed in June and he testified that he could not say if it was the same as the other agreement. (Doc. 203-1, p. 54).

AmSpec was going to open an office in Mobile. (Doc. 203-5, p. 4). Bartlett provided Saybolt with a copy of his employee agreement with AmSpec when he was hired. (Doc. 203-8, p. 3).

Mr. Cowan asked Bartlett to go to Saybolt in Saraland to meet with employees there and while there they interviewed each person who was leaving. (Doc. 203-1, pp. 19-20). Bartlett testified that he thinks Cowan called him because he trusted him and "he needed somebody to go with him and maybe witness some of this stuff." (Doc. 203-1, p. 18). Cowan testified that he wanted Bartlett there for support, because they had seven people resigning and it had to be a team effort to try to retain people. (Doc. 208-15, p. 4).

Saybolt has hired three laboratory technicians in Louisiana since Bartlett began working for Saybolt. Cowan interviewed Derrick Freman and Chris Arnold who came from AmSpec and started working for Saybolt in the first quarter of 2017. (Doc. 245-2, p. 4). They were hired with no assistance from Bartlett. (Doc. 245-2, p. 4). Cowan recruited Derrick Freman (Doc. 245-2, p. 6). Cowan also hired Andrew Poland. (Doc. 245-2, p. 5).

According to Hugh Freeman, when Hugh Freeman gave notice that he was leaving Saybolt to work to AmSpec, Bartlett called him and said:

> AmSpec was not a good company to work for, that they couldn't be
> trusted, that if I was going to AmSpec, that I better have my offer –
> that I better have it in writing, the offer. They were – where he worked
> at, they -- you had to go ask for everything that you needed during
> your daily – Him daily working in the lab, stuff that should be readily
> available, he would have to go ask for it.

(Doc. 203-6, p. 3). According to Freeman, Bartlett said he did not get paid what AmSpec had originally discussed and that he tried to talk with them about it, but nothing was done. (Doc. 203-6, p. 4). Bartlett said AmSpec was a bad company and "you couldn't trust upper management," and specifically mentioned Malcolm. (Doc. 203-6, p. 4). Bartlett told Freeman that AmSpec "was a shitty company to work for." (Doc. 203-6, p. 5).

According to Bartlett, Cowan told him Freeman had turned in his notice and Cowan asked Bartlett to call Freeman and share his past experiences with him and see if he could talk him out of leaving. (Doc. 203-1, p. 13). Bartlett says he was referring to his past experiences with Camin Cargo. (Doc. 203-1, pp. 13-14). Bartlett testified that he never discussed his experience with AmSpec, but he admits telling Freeman that "it was a better opportunity with Saybolt." (Doc. 203-1, p. 14).

Travis Stair also testified that Bartlett told him AmSpec "was a shitty company to work for." (Doc. 203-9, p. 3). Stair says Bartlett told him "it was extremely hard to get anything done there because everything was kept under lock and key, that he had worked under Frey who he called an asshole." (Doc. 203-9, p. 3). Stair testified that Bartlett said AmSpec "had done him wrong" – that they had promised him one thing and had not given it to him and that upper management were "snakes." (Doc. 203-9, pp. 3-4). Bartlett reportedly told him that he "better be damn sure to get everything I wanted in writing because they didn't keep their promises, that they would promise you the moon, hire you in, you know, use you for

what you knew and let you go." (Doc. 203-9, p. 4). Stair said Bartlett mentioned other companies he had worked for such as Camin Cargo when he listed his background and qualifications but did not talk about his experiences there. (Doc. 203-9, p. 4).

Gary Lynch testified that Bartlett told him about his time with AmSpec and that they could not be trusted. (Doc. 203-7, pp. 3-4). Lynch said Bartlett came in with Cowan to try to talk people out of leaving.

Bartlett says he never said anything negative to Freeman, Stair, Huang, or any other employee of Saybolt about AmSpec. (Doc. 203-1, p. 15, 21). Bartlett admits saying that Mr. Thieler had told him a salary range and when he started it was a lot less and then giving general advice that he wished he had gotten it in writing. (Doc. 203-1, pp. 15-16). Bartlett says he felt and told Freeman, being close to his age, that "it may not work out for you and you are let go or are out of work for any reason, it is basically much harder to find employment. That was my experience." (Doc. 203-1, p. 17).

Cowan asked Bartlett to let him know if he knew of anyone in the area that could possibly be a good fit for a manager role at Saybolt. (Doc. 203-5, p. 5). According to Cowan, he told Bartlett that if he knew anyone in the area, to call and put them in touch with him. (Doc. 203-5, p. 5). Bartlett talked to Brian Stahl at Chevron. (Doc. 203-5, p. 5).

As Branch Manager of Louisiana at Saybolt, Bartlett's duties include trying to grow the business. (Doc. 203-1, p. 50). Bartlett put together a PowerPoint

presentation with an analysis of the Louisiana market. (Doc. 203-5, p. 6). Bartlett testified that Saybolt had asked him to put together a business plan targeting business and potential talent in the area and he put together one slide for that listing 15-20 people. (Doc. 203-1, pp. 24-25). He also put together several PowerPoint slides for the marketing survey listing the different terminals, refineries and approximate dollar values given to the amount of work. (Doc. 203-1, p. 26). He drafted a pie chart with the different spokes for companies and the approximate market share for each one. (Doc. 203-1, p. 26). There was a slide listing potential customers by the company names and the names of the particular schedulers to approach. (Doc. 203-1, p. 26). Two AmSpec employees, Russell Bujol and Ben McKinney, were on the list. (Doc. 203-1, p. 27). The PowerPoint lists the customers with whom Mr. McKinney has a relationship, McKinney's current salary, and says he "brings about 80K a month to AmSpec." (Doc. 203-5, p. 10). This was a survey of Saybolt's competition, the list was not intended for Saybolt to contact the people. (Doc. 203-1, pp. 28-29). According to Bartlett, neither he nor Saybolt went after any of the people on the list. (Doc. 203-1, pp. 29-10).

Russell Bujol worked for Saybolt before - back in 1976 - but has worked for AmSpec for three years and other companies in between. (Doc. 202-12, p. 2). Bujol testified that he is not aware of Bartlett ever trying to recruit somebody from AmSpec. (Doc. 202-12). However, Bujol also testified that Bartlett tried to recruit him to come to Saybolt. (Doc. 203-3, p. 3). Bujol reported that Bartlett told him Saybolt was making changes and things were getting better, and Bartlett knew Bujol was the key when Bujol was there with clients and he thought Bujol would be

a great asset back at Saybolt running the marketing for them. (Doc. 203-3, p. 3).

When prospective employees contacted Bartlett, Bartlett would act as the conduit and turn them to Cowan. (Doc. 245-2, p. 2). In October 2016, Russell Bujol reportedly reached out to Bartlett, and Cowan then met with Bujol. (Doc. 245-2, p. 2; Doc. 203-1, pp. 30-31). Bartlett gave Cowan Bujol's background and told him he knew him to be good at his job. (Doc. 245-2, p. 2; Doc. 203-1, p. 31). Saybolt did not even have any openings at the time and did not have a job for Bujol. (Doc. 245-2, p. 3). Bujol met with Eric Moore[4] some time later at a restaurant and Bartlett was present. (Doc. 203-1, pp. 32-33). According to Bartlett, they had lunch and made small talk and then Bartlett walked off to let Bujol and Moore talk. (Doc. 203-1, pp. 34-35). At some point later, Bujol told Bartlett he had some health issues and that his wife had some concerns about him leaving AmSpec and Bartlett told him, he thought Mr. Cowan had been trying to reach him and to "just hear him out" and "do what you gotta do." (Doc. 203-1, pp. 36-37). Bartlett told Bujol his health was what's important. (Doc. 203-1, p. 37). Bartlett sent following three text messages to Bujol:

> Talked to James Cowan this morning. He talked to Peter Boks about you. He wants you back and told James that we should pursue you. So, I know he was someone you were worried about. If James calls you, don't let on that I told you this. I'd really like you to listen to what they have to say and keep an open mind.
> Thanks, Chris
>
> Thanks, I know your wife has concerns but if you could just hear them out. I talked with the new head of operations James Garza and some guy named Hans. Wanted me to help give them a breakdown of the

[4] In March or April of 2017, Eric Moore was fired by Saybolt. (Doc. 203-1, p. 37).

local market and who the key players were in this area. Told them that you were on the top of the list. Don't tell Lascala I said that! Lol

James called me again and they apparently want to move quickly with regards to bringing you back. He's probably going to call you this afternoon or tomorrow. Just express all of your concerns to him. Let me know if there's anything I can do to help.

(Doc. Doc. 203-2, pp. 16-17). Bartlett testified he was not recruiting Bujol, he was just helping a friend "get an opportunity for something he wanted to – in a position he had – he wanted to get out of" because Bujol came to him looking for an opportunity. (Doc. 203-1, pp. 40-41).

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250.

(internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or

denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. Choice of Law

"[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1139 (11th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Adhering to the principle of *lex loci contractus*, Alabama courts hold that contract claims are governed by the laws of the state in which the contract was made, unless the contracting parties chose a particular state's laws to govern their agreement. *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala. 1991). Here, the contract was executed in Louisiana, but the contracting parties chose the laws of the state of New Jersey to govern their agreement. "Alabama law has long recognized the right of parties to an

agreement to choose a particular state's laws to govern an agreement." *Id.* Thus, under the above principles, the contract claims would be governed by the laws of New Jersey. However, Saybolt and Bartlett assert that this Court should decline to enforce the choice-of law provision and should instead apply Alabama law to AmSpec's contract claims because New Jersey law is contrary to Alabama law relating to restrictive covenants. To resolve such conflicts of laws questions, Alabama Courts have applied the choice of law approach set forth in *Blalock v. Perfect Subscription Co.*, 458 F.Supp. 123 (S.D. Ala. 1978). *See Cherry*, 582 So.2d at 506. In *Blalock* this Court cited and adopted the approach set forth by the Restatement (Second) of Conflicts of Law, which provides as follows:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 187 (1971). The Alabama Supreme Court has found that "Alabama's policy against covenants not to compete is a fundamental public policy." *Cherry*, 582 So.2d at 506. In *Cherry*, the Supreme

Court found that Alabama law should apply because: (1) application of North Carolina law would be contrary to Alabama's policy against covenants not to compete, (2) Alabama law would be applicable but for the parties' choice of North Carolina law, and (3) Alabama has a materially greater interest than North Carolina in the determination of the issue because the party was attempting to enforce a covenant not to compete in Alabama and against an Alabama resident. *Id.* "Thus, where Alabama law would be applicable, but for the parties' selection of another state's law, and where Alabama has a greater material interest, notably a covenant that is to be enforced in Alabama and against an Alabama resident, Alabama courts will not apply another state's law, if the covenant not to compete is void under Alabama law." *Benchmark Med. Holdings, Inc. v. Rehab Sols., LLC*, 307 F. Supp. 2d 1249, 1260 (M.D. Ala. 2004) (citing *Cherry supra*). However, in this case, the contracts were executed in Louisiana, not Alabama, so Alabama law would not apply regardless of the contract's choice of law. Under the principle of *lex loci contractus*, Louisiana law would apply absent the choice of law clause. Moreover, Alabama has little connection to the claim, since AmSpec, which is a New Jersey limited partnership with its principal place of business in New Jersey, is attempting to enforce a Louisiana contract against a Louisiana individual regarding his actions while working for the Louisiana office of a Delaware limited partnership that has its principal place of business in Texas. Although some of the conduct AmSpec alleges breached the agreement occurred in Alabama, the Court finds that Alabama does not have a materially greater interest than New Jersey in the determination of the issues here. Accordingly, the law chosen by the parties in the agreement, New

Jersey law, will apply to AmSpec's breach of contract claim against Bartlett.

The contract provision choosing New Jersey law does not apply to AmSpec's claim of tortious interference. Since the claim is a tort claim the principle of *lex loci delicti* applies. "Under the principle of *lex loci delicti*, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Precision Gear Co. v. Continental Motors, Inc.*, 135 So. 3d 953, 956 (Ala. 2013) (quoting *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009)). Here, the alleged injury occurred primarily in Alabama where AmSpec has an office and claims it suffered damage to its business reputation, opportunities and ability to freely recruit personnel along the Gulf Coast.[5]

## C. Breach of Contract

"Under New Jersey law, to establish a claim for breach of contract, a plaintiff must 'prove that a valid contract existed, [the d]efendant materially breached the contract and [the p]laintiff suffered damages as a result of the breach.' " *Moreno v. Tringali*, 2017 WL 2779746, at *4 (D.N.J. June 27, 2017) (citations omitted). Bartlett argues that the employee agreement is not enforceable under Alabama law, but makes no such argument under New Jersey law. Since the Court has determined that New Jersey law applies to the breach of contract claim, the Court finds that AmSpec has met its burden of demonstrating that a valid contract

---

[5] The Court notes that both parties cite Alabama law in their arguments regarding the tortious interference claim and neither party has argued that another state's law should apply.

existed. AmSpec claims that Bartlett breached two clauses in the employment agreement: the non-solicitation clause and the non-disparagement clause. Bartlett disputes that he breached either of these clauses and asserts that AmSpec has not shown damages.

### 1. Non-Solicitation

Neither party has suggested that a New Jersey statute or common law principal prohibits the enforceability of the clauses at issues here. The Court is therefore tasked with interpreting the clauses and applying them to the evidence submitted by the parties. Interpretation of contracts under New Jersey law must adhere to the following principles:

> New Jersey courts tasked with interpreting a contract must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *State Troopers Fraternal Ass? of New Jersey, Inc. v. State*, 149 N.J. 38, 47, 692 A.2d 519, 523 (1997). "Contracts should be read 'as a whole in a fair and common sense manner.'" *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118, 85 A.3d 947, 958 (2014) (quoting *Hardy ex rel. Dowdell v. Abdul–Matin*, 198 N.J. 95, 103, 965 A.2d 1165 (2009)). Thus, "[t]he court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" *Pacifico v. Pacifico*, 190 N.J. 258, 266, 920 A.2d 73, 77 (2007) (quoting *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 302, 96 A.2d 652 (1953)).

*Saturn Wireless Consulting, LLC v. Aversa*, 2017 WL 1538157, at *10 (D.N.J. Apr. 26, 2017). The Court must also keep in mind New Jersey's general disfavor of restrictive employment covenants. As the Superior Court of New Jersey explained:

> That said, restrictive covenants in employment settings are not looked upon with favor as they potentially restrain trade. *Whitmyer Bros., Inc.*

> *v. Doyle*, 58 N.J. 25, 33–34 (1971). No entity has a legitimate interest
> in simply restricting competition. *Community Hospital Group, Inc. v.*
> *Moore*, 183 N.J. 36, 58 (2004). Restrictions that merely stifle
> competition are unenforceable. *Ingersoll–Rand Co. v. Ciavatta*, 110
> N.J. 609, 635 (1988). The validity and enforceability of restrictive
> covenants is fact sensitive and must be determined in light of the facts
> of a particular case. *Platinum Management, Inc. v. Dahmas*, 285
> N.J.Super. 274, 294 (Law Div.1995).

*U.S. Foodservice, Inc. v. Raad*, 2006 WL 1029653, at *7 (N.J. Super. Ct. Ch. Div.

Apr. 12, 2006).

Bartlett claims that he never solicited any AmSpec employees. Bartlett and

James Cowan testified that Bujol approached Bartlett at Saybolt and inquired

about working there and that Bartlett also had nothing to do with Saybolt hiring

the three lab technicians, Andrew Poland, Derrick Fremen, and Chris Arnold.

Bartlett appears to contend that the non-solicitation clause served only to prevent

him from making initial contact with former employees and affirmatively soliciting

their employment.  AmSpec disagrees, arguing that even if Bujol initially contacted

Bartlett, if Bartlett introduced Bujol to Cowan and others at Saybolt, that alone

amounts to solicitation. AmSpec contends that a recent New Jersey case, *Saturn*

*Wireless Consulting, LLC v. Aversa*, 2017 WL 1538157 (D.N.J. Apr. 26 2017), makes

clear that such introductions and any type of direct or indirect contact is prohibited.

However, the non-solicitation clause at issue in *Saturn Wireless* was different from

the clause at issue here.  In *Saturn Wireless*, the employment agreement required

the following:

> Employee will not directly or indirectly: ... (iii) knowingly contact or
> solicit, either directly or indirectly, any person, firm or entity
> connected with [Saturn], including its customers, clients, vendors, or

suppliers for the purpose of diverting work or business from [Saturn]. *Saturn Wireless*, 2017 WL 1538157 at *4. The defendant in *Saturn Wireless*, similar to Bartlett, claimed that he had never made initial contact and argued that merely being in contact with former clients does not constitute solicitation. *Id.* at *11. Relying on the plain language of the contract, the court found that because the provision is not limited to "solicitation" but also includes "contact," it did not matter whether the defendant had made the initial contact.  The provision prohibited contact, "even if one is returning, rather than placing a call." *Id.*

In the instant case, however, the non-solicitation clause does not prohibit "contact." Bartlett agreed not to "directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of AmSpec for the purpose of competing with AmSpec." Bartlett did not agree not to have any contact with an AmSpec employee. The plain language of the provision here does not prohibit contact and, therefore, the Court finds that if Bartlett merely returned Bujol's phone call, he would not have violated the agreement. The non-solicitation provision here also does not prohibit Bartlett from merely passing on information about Bujol to Cowan or others at Saybolt. Such facts, without more do not show solicitation, but could in combination with other evidence indicate that Bartlett was attempting to hire or recruit Bujol for the purpose of competing with AmSpec.

Bujol's own testimony contradicts itself because he stated that he is not aware of Bartlett ever trying to recruit somebody from AmSpec but also stated that

Bartlett tried to recruit him to come to Saybolt. Bartlett does not deny talking to Bujol or providing Cowan with Bujol's background and expressing his opinion that Bujol was good at his job. But Bartlett and Cowan maintain that Bartlett did not approach Bujol about working for Saybolt and did not actively recruit Bujol. Saybolt did not even have any openings at the time and did not have a job for Bujol. Bartlett was present when Bujol finally met with Eric Moore at a restaurant, but they reportedly only made small talk while Bartlett was present and Bartlett walked off to let Bujol and Moore talk. If this were the only evidence, there would be little to show that Bartlett actively pursued Bujol. However, Bartlett's text messages to Bujol, when viewed in the light most favorable to AmSpec, indicate Bartlett may have played a bigger role than he admits. Bartlett's texts could be read to indicate that he was trying to sell Bujol on the job at Saybolt. In the texts Bartlett pleads with Bujol "to listen to what they have to say and keep an open mind," "if you could just hear them out." The texts also indicate Bartlett did more than just pass on Bujol's information to Cowan. Bartlett was not only present at Bujol's lunch meeting with Eric Moore but continued to talk to several high-up people about Bujol working at Saybolt. Bartlett denies that he was trying to recruit Bujol and maintains he was just trying to help Bujol as a friend. Bartlett claims he even told Bujol that his health was what is important when Bujol expressed concerns about taking the job at Saybolt because of his health. However, the Court finds there is enough evidence that Bartlett was actively involved in recruiting Bujol to raise a genuine dispute as to whether Bartlett recruited Bujol.

### 2. Non-Disparagement

Bartlett agreed not to make "any defamatory or disparaging remarks, comments or statement" concerning AmSpec or its businesses, products or services or any of its employees or officers. To be "defamatory," a statement must be false. A defamatory statement expresses more than an opinion, it must suggest specific factual assertions that could be proven true or false. *See G.D. v. Kenny*, 411 N.J. Super. 176, 187 (App. Div. 2009), aff'd, 205 N.J. 275 (2011); *see also Karnell v. Campbell*, 206 N.J. Super. 81, 89 (App. Div. 1985) ("The question of whether the statement has a defamatory meaning does not even arise, however, unless the statement is an assertion or implication of 'fact.' "). However, "disparaging" has been defined by the United States District Court for the District of New Jersey as follows:

> The Oxford English Dictionary defines the adjective "disparaging" as "that disparages; that speaks of or treats slightingly, that brings reproach or discredit." It defines the verb "disparage" as "to bring discredit or reproach upon; to dishonor, discredit; to lower in credit or esteem," or as "to speak of or treat slightingly; to treat as something lower than it is; to undervalue; to vilify."

*Moreno v. Tringali*, 2017 WL 2779746, at *6 (D.N.J. June 27, 2017) (citations omitted). In *Moreno*, the Court found that "disparaging" as used in the agreement at issue in that case did not imply malice or falsehood.[6] *Id.* at *7.

---

[6] The Court notes that in *Moreno* the agreement included two separate paragraphs, one prohibiting defamation and a second that prohibited disparaging remarks or remarks that would cast "a negative light." *Id.* at *1. The *Moreno* Court found that "[i]n accordance with normal principles of contract interpretation, it would be unreasonable to subsume the first paragraph into the second" and conclude that both defamatory and disparaging remarks required proof that they were untrue. *Id.* at *7. The two words are used in the same paragraph in the instant case, but the parties have not suggested any reason why they should not each be given their

In the instant case, there is testimony that Bartlett made the following statements: AmSpec was not a good company to work for, they could not be trusted, AmSpec was a bad company, "you couldn't trust upper management," AmSpec "was a shitty company to work for," "it was extremely hard to get anything done there because everything was kept under lock and key, at AmSpec he had worked under Frey who was an "asshole," AmSpec "had done him wrong" –they had promised him one thing and had not given it to him, upper management were "snakes," and they would promise the moon, but did not keep their promises and would use you and then let you go. Clearly these statements could discredit or lower the esteem of AmSpec. Bartlett does not attempt to argue that the statements would not violate the non-disparagement provision, but fervidly denies that he made the statements or in some instances claims he was talking about another company. As such, the Court finds there is a genuine dispute of material fact regarding whether Bartlett violated the non-disparagement provision.

### 3. Damages

Saybolt and Bartlett contend that AmSpec was not damaged by the alleged breaches. Bujol was never hired by Saybolt and the Saybolt employees Bartlett reportedly tried to influence by making disparaging remarks about AmSpec apparently did not heed his advice and stayed at Saybolt. However, "[e]very failure to perform as required by a contract, even a small failure, is a breach that gives rise

---

plain meaning as defined by the Oxford English Dictionary and as used in *Moreno*. The parties have not proposed a different definition or argued that the *Moreno* definition should not be used.

to a claim for damages." *Luma Enterprises, L.L.C. v. Hunter Homes & Remodeling, L.L.C.*, 2013 WL 3284130, at *4 (N.J. Super. Ct. App. Div. July 1, 2013) (citing RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. a (1981)). "The general rule is that whenever there is a breach of contract … the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 45–46 (1984) (citations omitted); *City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*, 2011 WL 3241579, at *4 (N.J. Super. Ct. App. Div. Aug. 1, 2011) ("liability for breach of contract does not require proof of damage beyond the breach itself"). Because the Court has found there is sufficient evidence of breach to survive summary judgment, the Court also finds there is sufficient evidence of damages to survive summary judgment.

## D. Tortious Interference with a Contract

The elements for a claim of intentional interference with a contractual relationship are as follows:

> (1) the existence of an enforceable contract; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.

*Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.*, 785 F. Supp. 2d 1258, 1279 (M.D. Ala. 2011) (citations omitted). Saybolt argues that it cannot be held liable for interfering with a contract that does not exist. Saybolt bases its argument on its contention that under Alabama law the employment agreement was void for lack of consideration because Bartlett was not yet employed at AmSpec when the

agreement was executed. However, because this Court has found that New Jersey, not Alabama law, applies to the agreement, that argument fails. This Court found, above, that AmSpec has met its burden of demonstrating that a valid contract existed and that there was sufficient evidence of a breach for the breach of contract claim to survive summary judgment. Accordingly, summary judgment on AmSpec's tortious interference claim also cannot be based on the lack of an enforceable contract.

Saybolt also contends that the tortious interference claim fails because AmSpec suffered no actual damages. "Under Alabama law, an award of nominal damages is proper when a defendant breached a contract but the plaintiff either suffered no actual damage or failed to prove actual damage." *Roberson v. C.P. Allen Const. Co.*, 50 So. 3d 471, 477 (Ala. Civ. App. 2010) (citation omitted). "Nominal damages are not based on the extent of any loss sustained as a result of the breach but are awarded in recognition of the invasion of the legal rights of the plaintiff." *Id.* (citation omitted). Similarly, where a party interferes with a contractual relationship there has been an invasion of legal rights that would support an award of nominal damages. *Id.* at 477–78 (citation omitted); *Engineered Cooling Servs., Inc. v. Star Serv., Inc. of Mobile*, 108 So. 3d 1022, 1030 (Ala. Civ. App. 2012) ("a plaintiff is entitled to an award of nominal damages when he or she proves that he or she was damaged by a defendant's intentional interference with the plaintiff's contractual relations but cannot prove the specific amount of his or her damage" (citation omitted)). In this case, Saybolt allegedly violated AmSpec's legal rights and, at the very least, AmSpec's reputation would reasonably be expected to have

been harmed by the interference. Accordingly, the Court finds AmSpec's tortious interference claim does not fail for lack of proof of damages.

## CONCLUSION

For the reasons stated above, AmSpec's motion for partial summary judgment on its Counterclaim against Saybolt and its third-party claim against Christopher Bartlett (Doc. 200, 201), and Saybolt and Bartlett's motion for summary judgment (Doc. 202), are **DENIED.**

**DONE** and **ORDERED** this 9th day of May, 2018.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE